Filed 7/19/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S115378 |
| v. | ) | |
| | ) | |
| STEVE WOODRUFF, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. RIF095875 |
| _____ | ) | |

A jury convicted defendant of the first degree murder of Riverside Police Officer Charles Douglas Jacobs and the attempted murder of Police Officer Benjamin Baker. (Pen. Code, §§ 187, 664.)[1] It found true three special circumstances allegations: murder to avoid or prevent a lawful arrest, intentional killing of a peace officer engaged in the performance of his or her duties, and murder by means of lying in wait. (§§ 190.2, subd. (a)(5), (7), (15).) It also found true allegations of personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)) and personal discharge of a firearm (§ 12022.53, subd. (c)).

After finding that defendant did not have an intellectual disability, and following a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4, subd. (e)) and imposed a judgment of death. It also imposed a prison sentence on the other counts and

---

[1] All further statutory citations are to the Penal Code unless otherwise stated.

1

enhancement allegations. This appeal is automatic. (§ 1239, subd. (b).) We reverse the judgment of death because of the erroneous exclusion of a prospective juror during jury selection and remand the case for a new penalty trial. We affirm the judgment in all other aspects.

## I. THE FACTS

### A. Guilt Phase

#### 1. Overview

Police responded to a neighbor's call that defendant's mother, who lived in a two-unit house upstairs from defendant, was playing a loud radio outside, which had been a longstanding source of conflict. Because the mother refused to turn down the radio, officers began to arrest her. During the process, defendant, who had retrieved a gun from his house and was watching and listening from his porch, leaned into the outdoor stairwell leading up to the mother's apartment, and, as observed by Officer Benjamin Baker and by a neighbor, fired up at the officers, killing Officer Douglas Jacobs. That evening, defendant admitted to the police that he shot Jacobs. At trial, however, he denied killing Jacobs, and he also presented evidence to contest the required mental state. The parties also presented contested evidence as to whether defendant had an intellectual disability and a brain injury.

#### 2. Prosecution Evidence

On the afternoon of January 13, 2001, Holly Menzies called the Riverside Police Department because her neighbor Parthenia Carr had been playing very loud music outside for 45 minutes. Carr lived upstairs and her son, defendant, lived downstairs in a two-unit house. Carr would play her radio outside her door on the landing at the top of her stairs. Over the past year, Menzies and her

2

husband had spoken to Carr several times about the loud music and had reported it to the police at least twice. Carr's response invariably was contentious and angry.

On-duty Police Officer Baker responded to the disturbance call. When he arrived at the residence, he saw a portable radio outside, on the landing. The music was at its maximum volume and "extremely loud," such that other sounds were inaudible.

There was a porch on the ground floor. Seeing someone moving inside the house, Baker asked through the screen door if the person had called the police. The male, defendant, responded "No," and that it was his mother's radio upstairs.

Baker went upstairs and turned off the radio. Carr opened the screen door and "began screaming and yelling, saying that it was her radio, it's her property. [Baker had] no right to touch her radio . . . ." Baker informed Carr about the disturbance call. Carr was angry and "out of control pretty much the entire time [Baker] was there, constantly talking, not pausing between words, just constantly saying something." She threatened to sue Baker for violating her Fourth Amendment rights.

Baker radioed his supervisor, Sergeant Leach, for assistance. Leach responded he was en route. Baker continued to speak with Carr, who refused to cooperate. Baker informed Carr he would arrest her for disturbing the peace if she did not lower the radio volume.

Baker left to speak with Menzies. The music sounded "extremely loud" from outside Menzies's house. Menzies signed a citizen's arrest form but wanted to speak with Carr to resolve the situation informally. Baker accompanied Menzies to Carr's landing to provide assistance. Carr came out on the landing and "immediately began screaming" at Menzies, pushed open the screen door into Menzies's foot, and "lunged" toward Menzies, startling her. According to Menzies, she was jostled when Carr opened the door and she did not perceive that

Carr was intentionally pushing her. Baker stepped between them and Menzies started walking down the stairs. Menzies observed Baker to be "exceedingly polite" throughout the encounter.

Baker grabbed Carr's wrist to arrest her for disturbing the peace and for committing battery on Menzies. Menzies, who had returned to her home, could from a window hear Carr tell Baker he could not arrest her. At that point, Claude Carr (Claude), who, unbeknownst to Baker, had been sleeping inside, came out and stepped between Baker and Carr, within four inches of Baker, and told him to "[g]et your hands off my mom."

Baker then heard defendant say from downstairs in a threatening manner, "You better not touch my momma." Baker saw defendant leaning over the stairway from the porch. Mark Delgado, who lived across the street and had been outside washing his car, saw defendant come out of his house, walk to the end of the porch and look up, and say something like, "Don't be touchin' my momma. Leave my momma alone."

Feeling unsafe, Baker called for immediate assistance. Within a couple of minutes, Jacobs, Baker's beat partner, arrived and Baker met him in the middle of the stairs to brief him on the situation. Baker had determined to arrest Carr and Claude, and wanted to wait for Leach for additional assistance. While waiting, Baker and Jacobs walked up to the landing to prevent Carr and Claude from going inside and creating an unsecure situation. The officers informed Carr they were detaining her for disturbing the peace. Carr said she was going into her house if the officers did not leave and started to do so. Baker grabbed her wrist to start the arrest. Claude tried to grab Baker, so Jacobs grabbed Claude's wrist and put him in a wrist lock. Baker let go of Carr to assist Jacobs. Carr went into the house. When Claude became still, Baker reached for his handcuffs.

As Baker moved to handcuff Claude, he heard a gunshot. Baker immediately looked down the stairs where the shot came from and saw defendant standing on the porch, leaning over the railing with his body minimally exposed, pointing a handgun up at the officers. Baker let go of Claude, saw Jacobs going into the house, and thought Jacobs was taking cover. According to Claude, Jacobs looked surprised and pushed Claude to the ground as Claude heard gunfire. Baker was not sure if he was the only one on the landing at that point. He grabbed his gun, a .40-caliber firearm, and fired at defendant.

Baker saw defendant, who had fired the first shot, point the gun in his direction and shoot multiple times. Jacobs did not have his gun out. Defendant retreated after Baker's third shot.

After defendant had told the officers to leave Carr alone, Delgado saw him walk back into his house for a second and come back out. He looked across at Delgado. Delgado noticed defendant had a silver- or chrome-plated handgun. When Delgado looked over, defendant put the gun behind his back slightly. Defendant walked to the end of the porch, peeked up over the railing furtively, held the gun up and aimed, firing twice without hesitation. He then walked quickly back into the house. Delgado had an unobstructed view of defendant. Defendant looked agitated and like he "didn't think twice" before getting the gun and shooting. No more than 30 seconds passed from the time defendant told the police to leave Carr alone to the time he fired the gun. Menzies had heard Claude yell "No, don't," in a "heart-wrenching plea" to defendant just before she heard shots.

Baker realized Jacobs, who was lying faceup with his torso in Carr's doorway, had been shot. Blood was coming out of Jacobs's nose "like a water faucet," and his airway was full of blood. Baker could not feel a pulse. He radioed that an officer was down. Baker saw Leach arriving and advised him that

5

defendant was downstairs and had shot Jacobs. Leach took Carr and Claude down to the curb. A paramedic arriving to assist observed that Jacobs's gun was holstered.

Other officers arrived. They set up a perimeter around the house, announced their presence over a speaker system, and ordered anyone in the house to come out.

Suddenly the downstairs door flew open, defendant yelled that he was coming out, and he threw out a rifle. Defendant crawled out of the house naked. The police arrested defendant and put him in a squad car. They later found a jammed bullet in the rifle.

Defendant told the officer who was handcuffing him that he was sorry or that he had not meant "to do this." During the ride to the station, defendant volunteered that he did not mean to kill the officer and had panicked because they would not let Carr go.

After securing the house, officers found defendant's four-year-old daughter hiding under a bed. They found a rifle and bullets on the bedroom floor along with .30- and .44-caliber ammunition in the closet area, a Lorcin nine-millimeter handgun on the kitchen stove and a rifle in the pantry, and expended shotgun shells and two 9-millimeter Speer casings in the backyard. The police took photos of a possible bullet strike to the wall adjacent to the outside stairs. About a year later, the police cut out a portion of the wall and found a bullet lodged inside.

Detectives interviewed defendant the evening of the shooting. Defendant told them that when Baker first arrived, defendant called his brother John Woodruff (John) to say that the police were there again harassing Carr. He went outside and heard Baker tell Carr that she would go to jail if she did not turn down her music. Defendant watched for a minute until he saw Baker calling someone. He then walked into his house and retrieved his gun from the bedroom closet,

6

loaded it, and placed it on the television. Watching from inside his front door, defendant saw Jacobs arrive in his police car, jump out, and run up the stairs.

Defendant went outside with the gun to listen. Nobody could see the gun. He listened for about one or two minutes, until he heard Claude ask the officers to wait for a sergeant. Jacobs responded, "We're not waitin' on no sergeant," and grabbed Carr. Defendant told Jacobs to let Carr go and fired his gun. Defendant fired three times and ran into the house. The officers returned fire. Once inside, defendant got a rifle because he thought the officers might kill him, but then changed his mind, threw the gun out of the house, removed his clothes so that the police would not shoot him, and crawled out. Defendant acknowledged that the rifle had jammed.

Defendant explained he panicked, and was not thinking but instead reacted. He did not aim. He explained that the police would come to the house two or three times a day about the loud music and that Menzies was using the police to harass Carr. John had filed a complaint about it with the police.

In response to defendant's explanation that he panicked, the detectives pointed out that he had retrieved his gun, and then watched and waited before shooting at the officers. Defendant's response was that he did not "mean" to do it and that it was a coincidence that he hit Jacobs. When confronted with Baker's statement that he saw defendant aiming through the sight of his gun and with the interviewing detective's disbelief that defendant would not aim since his mother and brother were also in the group, defendant responded that he lost his "cool" and acknowledged that he was "mad." Defendant meant to shoot at the officers and shot Jacobs. He also acknowledged that the officers did not hurt Carr.

Carr testified that the police did not hurt her. Delgado could hear Carr yelling but she was not calling for help and did not sound scared or in pain.

7

Jacobs died from a bullet entering his nose and passing through the base of his brain. It destroyed 50 percent of his brain stem and rendered him immediately unconscious.

Senior criminalist Richard Takenaga compared bullets test-fired from the Lorcin recovered from defendant's kitchen to the Speer bullet recovered from Jacobs's skull and concluded that the Lorcin had discharged the bullet that killed Jacobs. The bullet found in the wall was damaged and difficult to compare, but had characteristics similar to those of the bullet from the Lorcin.

### 3. Defense Evidence

Carr testified on cross-examination in the prosecution's case that Baker seemed angry. Baker grabbed Claude by the wrist and took his gun out and pointed it at Claude. Carr was crying and felt afraid and angry. Carr testified that she grew up in Mississippi watching the civil rights movement and felt she had not committed any crime or broken any law that day and that Baker was violating her constitutional rights. She felt that the police shoot and kill Black people, including "Tyisha Miller" (an apparent reference to a police killing of a young African-American woman about two years before this shooting), and that they had been harassing her family. She described an incident in which she said that the police would not let her other son Jimmy Taylor use the bathroom and arrested him for urinating on a tree. The police had been to the house about the radio three or four times but they had never harmed her.

Defendant testified and denied shooting Jacobs. When Jacobs arrived, defendant saw that he was wearing a gun and moving fast. Defendant got his gun because he was "afraid that the police had sent some crooked police" to his house who were "disrespectful [and] prejudiced." He feared the police would harm Carr because he knew she would not turn down the radio volume. Carr seemed upset

8

and yelled, "You're hurtin' me." Defendant thought the police were hurting Carr when he heard her screaming, and "chills" went over his body. Defendant was "furious" and "ready to go to war."

Defendant got his gun, ran across the porch to the railing, raised his gun, and asked the officers what they were doing. When Baker saw defendant's gun, Baker reached for his gun. Defendant shot first, over Baker's head, when he saw that Baker was going to shoot him. Baker started shooting and defendant returned fire before going into the house.

Stella Alvarez lived across the street and had been cooking dinner that day by her kitchen window. She saw the police go up Carr's stairs with Menzies, saw Menzies hurry down the stairs, and heard a male voice say to leave his mom alone. Alvarez then heard gunfire and saw defendant run in and out of his house, but did not see weapons on him.

John, defendant's brother, testified that defendant called him that day to come over because the police were harassing Carr and defendant was concerned because he had a driving under the influence (DUI) warrant and did not want to go outside. Defendant did not recall telling John about a warrant.

Several years before the shooting, Carr had had a mental breakdown and was diagnosed with paranoid schizophrenia. Before moving in, defendant would visit Carr most days and would cook and go to the store for her. Defendant explained, "She was the only one that raised me and . . . in '63, you know, it was hard back then. And she did not leave us, you know. She kept her responsibilities . . . ." Defendant worried about Carr because she became hard to handle after her breakdown. Carr played the radio because it would calm her and make her happy.

Defendant recounted the four previous times that the police had come to his house about the radio and said John had filed a complaint with the police for

9

harassing Carr. Defendant felt the police were harassing his family because of where he grew up. He described what he had observed of the incident concerning Jimmy Taylor. Defendant later saw his mother crying and upset about the incident. He knew Tyisha Miller's mother and felt that the police had murdered Miller and had no regard for Black people. John also testified that the police had come to the house three or four times and that he had filed a complaint with the police.

Defendant could read and write "[a] little" and reached the tenth grade in school. He was an electrician by trade and did plumbing and Sheetrock work and worked on cars. He had worked for the Press-Enterprise newspaper as a driver and would count, stack, and bundle the papers. He had a "learning problem" and was in special education classes. He was in the process of purchasing the house he lived in and knew about escrow.

Defendant had been knocked unconscious three times in his life, including in 1985 when a car ran over him. He lost consciousness, suffered spinal injuries and a split skull, and had to learn to walk again.

Dr. Joseph Wu, a physician and clinical director of the University of California, Irvine School of Medicine's Brain Imaging Center, evaluated defendant for brain injury by administering a PET (positron emission tomography) scan, which shows activity in the brain. Wu compared defendant's scan to that of 56 "normal" patients, meaning patients who did not have identified brain disease. Specifically, Wu compared defendant's scan to an image generated from the 56 normal patients that was also "normalized" for differences in age, gender, brain size, and shape. Wu observed abnormalities in defendant's temporal lobe, interior cortex, and central cortex. The abnormalities observed would affect the ability to regulate emotion, to think "appropriately or correctly," and to make abstract inferences. Based on his review of the PET scan and defendant's medical records,

10

which stated defendant had suffered head injuries when he was run over by a car in 1985 and assaulted in 1989, Wu opined that defendant had traumatic brain injury.

Dr. Curtis Booraem, a clinical psychologist, evaluated defendant. Booraem was experienced in assessing people with developmental disabilities but had never been court-appointed for an evaluation in a criminal case. He met with defendant, administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), reviewed defendant's school and medical records, and concluded defendant was a "high functioning" intellectually disabled person. Defendant had a full-scale IQ score of 66, a verbal score of 68, and a performance score of 69. In school, defendant was diagnosed with a learning disability, earned mostly D's and F's, and scored poorly on standardized and diagnostic tests.

Booraem took a limited social history of defendant and found him to be a person of few words. Defendant's affect was flat, which is an indication of mental illness or brain dysfunction. Booraem observed defendant to be emotional and distraught in the video of the police interview, which would cause decreased intellectual functioning and would cause a person to say what the interviewer wanted.

### 4. Rebuttal Evidence

Dr. Alan Waxman, a physician and co-chair of the department of imaging for Cedars-Sinai Medical Center in Los Angeles, reviewed Wu's assessment. Waxman concluded that Wu's method was appropriate for research but not diagnostics. He criticized Wu's methodology of "morph[ing]" the 56 images of normal brains to fit into the same shape for comparison, which would result in artificial "abnormalities" and faulty comparison, and he challenged Wu's lack of validation of his method. Waxman explained that Wu's scanning machine, which

11

was "almost an obsolete machine," would not have accounted for variation in skull thickness and would have produced a lot of image "noise." Two colleagues performed a blind comparison of defendant's brain to the 56 normal brains and found defendant's brain to be one of the more "normal" brains, with fewer irregularities and asymmetries. Waxman concluded defendant's brain was a "normal brain." Waxman did not perform any tests on defendant's brain using his own brain imaging machine.

Dr. Craig Rath, a clinical psychologist, evaluated defendant. Rath had performed evaluations in over 6,500 court cases, including approximately 400 court-appointed defense evaluations on intellectual disability, and had testified mostly for the defense. Rath met with defendant three times, reviewed his records, and readministered the WAIS-III. Defendant had a full-scale IQ of 78, a verbal quotient of 80, and a performance quotient of 79. Rath readministered the WAIS-III because defendant said he had not tried hard the first time. Rath would have accounted for "practice effects" of retaking the test within five months but defendant's areas of improvement would not have been due to test familiarity. According to Rath, it is not possible for an intellectually disabled individual to fake more aptitude than his true capacity. Defendant scored 86 on the Vineland Adaptive Behavior Scales test (Vineland test), administered by Rath, and a 65 on the communication portion of the test.

Based on his experience with approximately 1,000 intellectually disabled individuals, Rath had no doubt that defendant was not intellectually disabled. Defendant had a learning disability. Rath, however, observed defendant to be communicative, providing detailed information, understanding the questions posed by Rath, and recalling his personal history with general accuracy. Defendant recalled he had worked as an electrician through the temporary agency Manpower, at a factory assembly, and at the Press-Enterprise newspaper, where he had

managed a crew. Defendant had performed commercial work where he would "wire rooms, run wires, fix switches, install[] receptacles," and, in his own words, "troubleshoot[]." He also repaired automobiles.

Defendant demonstrated levels of abstract reasoning inconsistent with intellectual disability, such as explaining that we study history to learn where we have been, who we are, and where we are going. Removing his clothing so that the police would not shoot him was another example of defendant's abstract reasoning ability, which was all the more significant given the high-stress situation. Defendant was able to discuss abstract concepts that he had learned from the Bible and could describe his cooking skills, his ability to write and mail letters and make long-distance phone calls, the events for which he was charged, world events, and card games he had played, as well as his understanding of the fundamentals of chess. Defendant described daily activities of self-care and personal shopping, passing the written test to obtain a driver's license, his ability to drive and follow directions, and his ability to engage in monetary transactions with the assistance of a calculator, all of which indicated higher-level functioning and adaptive behavior. At age 30, defendant was able to successfully apply the Heimlich maneuver, which he learned in high school, on a child that he had observed choking in a restaurant.

**B. Intellectual Disability Phase**

Booraem, the sole witness to testify during the intellectual disability hearing, concluded defendant was "mildly" intellectually disabled. Booraem explained that intellectual disability is typically ascribed to people with an IQ under 70 to 75, taking into consideration the standard error of measurement, along with deficiency in at least two areas of adaptive behavior.

13

Booraem concluded defendant had adaptive deficits in communication, academics, work, and self-direction. Defendant was deficient in communication based on his score of 65 on that portion of the Vineland test. Defendant had earned poor grades in school, tested at the third or fourth grade level in various subject areas at age 16, and had been diagnosed with a learning disability. Defendant was "significantly deficient" in the areas of self-direction and work because he had had only brief periods of employment and seemed "satisfied with not being employed."

### C. Penalty Phase

The prosecution presented evidence of defendant's criminal activity involving the use or threatened use of force or violence (§ 190.3, factor (b)), and the impact of the incident on Baker and on the victims' families.

In a 1988 physical altercation initiated by a previous live-in girlfriend, Patricia Woodson, defendant repeatedly pushed Woodson, causing her arm to go through a window and requiring hospital treatment.

In 1989, a man named Arnold Palmer, his sister Tamara, and Clinton Williams went to a liquor store. Children were in the car. Defendant, his cousin Dennis Smith, another adult passed out drunk, and children were in another car parked nearby. An altercation developed and accounts varied as to who shot first. Tamara observed two shooters, Smith and another man who was not defendant. The other man shot at Palmer. Palmer died from a bullet wound and Williams was shot in the stomach. Smith testified that defendant was present, but he thought defendant was in the liquor store or in the car during the shooting. Smith did not see defendant with a gun. Freddy Williamson, who was friends with defendant, told a detective that defendant said he was involved in a liquor store shootout and

14

a bullet grazed his shoulder. The detective visited defendant in jail and observed a scar on his shoulder.

A few days after the liquor store shooting, the police arrested defendant and Smith during a traffic stop in Arizona for possession of a concealed firearm as well as a second, altered, firearm.

In 1993, defendant robbed and assaulted Paul Spicer, who had to go to the hospital for a fractured wrist.

In 1999, the police arrested defendant for carrying a concealed weapon after his girlfriend Melvina Crowden called the police because defendant was upset that she was moving out and had showed her a gun.

In 1999, Freddy Williamson and Mario Brooks went to a house to buy marijuana. According to Williamson, four males approached their vehicle, and someone tried to hit Brooks with an object. Defendant might have been present. Someone shot Brooks. Williamson told a detective that defendant was involved in the confrontation. Another officer testified that "Eddie Phillips" told him during a hospital interview, while Phillips was receiving treatment for a gunshot wound, that defendant approached him that day while he was in a vehicle and tried to hit him with an object. The officer did not know if Phillips was the same person as Brooks.

Baker testified about having posttraumatic stress disorder and not returning to work as a police officer because of the event's impact on him and his family. He believed Jacobs probably saved his life. Baker's wife testified about the impacts of the shooting on her family, their two young children, and on Baker, who became withdrawn, lost his optimistic and cheerful demeanor, and suffered from nightmares.

Jacobs's widow, Tammy Jacobs, testified about her grief in losing her husband and having to make decisions alone, and the impact Jacobs's death had on

15

their daughter and on Tammy's son from a previous relationship. Jacobs had become a loving father to her son, who had since gone into a "downward spiral" and was in therapy and on medication. Jacobs had been studying for his master's degree. Jacobs's mother, Cathy Miller, testified about the grief that she and Jacobs's siblings experienced; the kind, hard-working and involved son Jacobs was from childhood; how he aided her as a single mother; and how he had diligently pursued his dream to become a police officer.

The defense presented evidence about defendant's background and mental functioning. John testified that defendant was born prematurely and was hospitalized for a month when he was run over by a car in 1985. Defendant had trouble holding a job and had lived in his van at times. Defendant worried about Carr. The family was religious. Defendant was a loving partner and father, including to a former partner's children. John's wife testified that defendant was kind, a loving dad, and not a violent person.

Wu testified that defendant had a brain injury that impairs a person's ability to regulate emotions and respond appropriately to provocation under stress. Dr. Booraem testified that defendant had the mental functioning of a 10-year-old, which meant that in emotional situations he tended to act in fight-or-flight mode.

## II. DISCUSSION

### A. Competence To Stand Trial

Citing several instances when he expressed on the record a lack of comprehension of certain aspects of the court proceedings, defendant contends the trial court erred in failing to declare a doubt, sua sponte, as to his competence to stand trial, and that remand is required for a retrospective competency determination.

16

"Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent." (*People v. Rogers* (2006) 39 Cal.4th 826, 846; see § 1367, subd. (a); *Drope v. Missouri* (1975) 420 U.S. 162, 172.) "A defendant is incompetent to stand trial if [he] is unable to consult with [his] attorney with a reasonable degree of rational understanding or lacks a rational and factual understanding of the proceedings against [him]." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 624.)

"The decision whether to order a competency hearing rests within the trial court's discretion, and may be disturbed upon appeal 'only where a doubt as to [mental competence] may be said to appear as a matter of law or where there is an abuse of discretion.' (See *People v. Pennington* (1967) 66 Cal.2d 508, 518 . . . .) When the court is presented with 'substantial evidence of present mental incompetence,' however, the defendant is 'entitled to a section 1368 hearing as a matter of right.' [Citation.] On review, our inquiry is focused not on the subjective opinion of the trial judge, but rather on whether there was substantial evidence raising a reasonable doubt concerning the defendant's competence to stand trial. [Citation.] . . . A trial court reversibly errs if it fails to hold a competency hearing when one is required under the substantial evidence test." (*People v. Mickel* (2016) 2 Cal.5th 181, 195.)

Defendant first points to statements he made during a pretrial hearing requested by the prosecution to inquire into the qualifications of retained pro bono counsel Mark Blankenship to try a capital case and whether defendant was making an informed decision as to his choice of counsel.[2] During the hearing, defendant

---

[2] Apparently, Blankenship agreed to represent defendant pro bono. We use the term "retained" in the sense that Blankenship's representation was secured by the defendant, rather than by court appointment.

responded to the trial court's suggestion that he listen to its review of pertinent case law with "I don't understand nothin' you sayin', Judge. . . . I'm not a lawyer, you know. I'm listening. I just don't understand." Later, when the court asked if defendant wanted to continue with Blankenship's representation, defendant explained, "Yes. I'll assure you, Judge, that, you know, there is a higher up that sent Mr. Blankenship to me, and he must be the one to represent me, you know, because there's someone over you and that you work for. So, I really don't understand what is really going on here, anyway, you know."

Further discussion with the court resolved defendant's comprehension difficulties. When defendant said he was listening but did not understand, the court responded that it would explain in nonlegal language. The court explained to defendant that it was his choice whether to proceed with Blankenship, that he had the right to an attorney, that the court would appoint one for him if he could not afford an attorney, and that the public defender's office had many experienced attorneys who had handled capital cases. The court emphasized Blankenship's lack of familiarity with the criminal justice system. The court admonished defendant to listen carefully, explained further that it had serious concerns about Blankenship's failure to request defense investigation funds, and told defendant again that if he could not afford an attorney, the court would appoint a qualified, experienced death penalty attorney to represent him. The trial court asked defendant if he understood, and defendant replied affirmatively. The court asked if he still wished to proceed with Blankenship, and defendant said that he did.

Regarding defendant's comment that a "higher up" had sent Blankenship to represent defendant, and that he did not understand what was "going on here," the court further explained that defendant needed to carefully consider his legal representation because he was facing a potential sentence of death. Nevertheless, the court reassured defendant that it could not later remove Blankenship against

18

defendant's wishes. When defendant expressed confusion about Blankenship's failure to request money, the court explained that money was available for the investigation of defendant's defense under state law. Defendant said that he understood.

Defendant's desire to proceed with Blankenship's representation because a "higher up" had sent Blankenship did not suggest an inability to understand the proceedings. On the contrary, it reflected defendant's desire to accept Blankenship as his attorney and thus defendant's ability to assist in his defense. Simply because, as defendant characterizes it, his comment indicated "a belief that his volunteer attorney was a gift from God," it does not follow that he was not competent to understand the proceedings. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 895 ["[R]eligion-infused comments," without more, are not indicative of mental illness and do not suggest the need for a competency determination].)

Second, defendant contends that his request for bail, despite his attorney's explanation that bail was not available in capital prosecutions, was another indication of his incompetence. But the fact that defendant, a nonlawyer, did not understand the unavailability of bail did not suggest incompetence. Neither defendant's confusion about bail nor his inability to understand the court's discussion of case law was evidence of inability to understand the proceedings against him. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1364 [" 'technical legal knowledge' " is irrelevant for determining competency].)

Reviewed in their entirety, defendant's comments at the hearing support a finding that he understood the proceedings and could communicate how he wanted to try his case. For example, defendant asked the court, "You, the Judge, is going to be doing this trial, too, right?" After the judge's affirmative response, he asked further, "They not gonna change you, right?" When the court responded affirmatively again, defendant stated, "Well, I'm satisfied." Defendant's questions

19

and comments showed that he could discuss his confusion with the court and express his concerns, and thus showed that he was able " 'to conduct his own defense in a rational manner.' " (*People v. Pennington, supra,* 66 Cal.2d at p. 515.)

As further evidence of incompetence, defendant next points to his trial testimony that he "somewhat" understood what was happening at trial that day, that he could read and write a "little bit," and that he did not understand what he was reading at the jail law library. We have reviewed defendant's testimony at trial and cannot conclude that defendant lacked understanding of the proceedings. Defendant answered questions coherently. On direct examination, he explained his protective relationship towards his mother and his family's negative experiences with law enforcement, and gave his account of what happened on the day of the shooting. On cross-examination, he was able to adhere to his version of events despite persistent questioning from the prosecutor. Similarly, he was able to appropriately state when he did not understand a question. Defendant "testified, in a completely rational manner, in his own defense." (*People v. Rundle* (2008) 43 Cal.4th 76, 180.)

Finally, defendant notes that defense evidence showed he had an IQ score of 66 and a verbal comprehension index score of 61. The prosecution expert testified defendant's full-scale IQ score was 78 and his verbal quotient was 80. As we have previously explained, the "evidence, which addressed defendant's alleged intellectual disability, did not pertain to the question of competence to stand trial. Although a defendant's incompetence to stand trial might, in some cases, be inferred from evidence of severe intellectual disability, the . . . evidence of possible incompetence presented here was not so substantial as to deprive the trial court of discretion. Therefore, we defer to the trial court, which heard the . . . evidence, observed defendant and the witnesses, and did not form a doubt

about defendant's mental competence." (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 467.)

We therefore see no due process or statutory error resulting from the absence of a competency hearing. For these reasons, we also reject defendant's claim of violation of his other federal constitutional rights.[3]

## B. Attorney Representation Issues

Attorney Mark Blankenship substituted in for the public defender as defendant's retained pro bono counsel a few days after defendant's arrest. Defendant raises a set of contentions related to asserted deficiencies in Blankenship's representation and his potential conflicts of interest. First, he contends the trial court erred in failing to remove Blankenship for incompetence and in failing to ensure that defendant had made a knowing and intelligent waiver of his right to effective assistance of counsel with respect to his decision to continue with Blankenship as his counsel. Next, he claims the trial court erred in misleading Blankenship regarding the requirements for appointment of cocounsel in a capital case and that Blankenship was ineffective for failing to request appointment of cocounsel. Finally, defendant contends his waivers of his rights to conflict-free counsel with respect to Blankenship's prior representation of two prosecution witnesses were not knowing, intelligent and voluntary.

---

[3] "With respect to this and other claims on appeal, defendant contends that the asserted error also violated various of his constitutional rights. The constitutional claims do not invoke [different] facts or legal standards . . . but merely assert that the alleged errors were also constitutional violations. Because we find no error, we necessarily also find no constitutional violation. Accordingly, we provide no separate constitutional discussion." (*People v. Avila* (2014) 59 Cal.4th 496, 513, fn. 3.)

21

### 1. Asserted Failure To Remove Blankenship for Incompetence and To Make Adequate Inquiry into Defendant's Choice of Counsel

Defendant contends the trial court failed to intervene and remove Blankenship for incompetence. Relatedly, defendant challenges the adequacy of the trial court's inquiry into defendant's choice of Blankenship as counsel. We review the pertinent proceedings below.

### a. Factual Background

#### i. Prosecution's Motion and the Ensuing Hearing on Blankenship's Qualifications for Capital Litigation and on Defendant's Choice of Counsel

In August 2001, about a month before trial, the prosecutor moved for a court inquiry into Blankenship's qualifications to try a capital case, and for an inquiry into whether defendant was making an informed choice regarding his retention of Blankenship, who was representing him pro bono, and if necessary to obtain a waiver from defendant that he wished to proceed with Blankenship's representation despite being informed that Blankenship had previously been suspended from the practice of law. The State Bar had previously suspended Blankenship from the practice of law for incompetence and he was serving a five-year probation.

At the hearing in September, Blankenship described his educational background and explained that he had handled "a variety of criminal trials" and "a strong handful of civil trials." The court asked him several questions about his trial preparation. Regarding whether he had considered filing a motion to set aside the indictment, Blankenship explained, "I would just as soon take my chances with the jury as opposed to outlining a series of evidentiary presentations which, to me, are tantamount to choreographing the strategy we intend to utilize at the trial level." Regarding change of venue, Blankenship believed defendant would get "a better trial in his own community," which was "suffering from racial strife when it

comes to minorities and law enforcement." Blankenship provided similar explanations regarding other motions he declined to file.

In reliance on our decision in *Smith v. Superior Court* (1968) 68 Cal.2d 547, the trial court decided not to remove Blankenship, concluding he had "set forth in an articulate fashion and demonstrate[d] clearly that [he had] considered these issues" and made strategic decisions after consultation with defendant.

The court explained to defendant two areas of concern. First, with a month remaining before trial, Blankenship had done little penalty phase investigation. Second, Blankenship had not applied for indigent defense funds. Blankenship responded he needed more time to prepare.

The court informed defendant that he had the right to representation by an attorney at no cost, and that the Riverside County Public Defender's Office had death penalty experienced attorneys. The court told defendant to "listen to me carefully" because it had "very, very serious concerns" that Blankenship had not sought defense funds. The court repeated, "If you cannot afford to hire an attorney, I will appoint an experienced death penalty qualified attorney to represent you." Defendant said that he understood.

As previously noted, defendant told the court, "I'll assure you, Judge, that, you know, there is a higher up that sent Mr. Blankenship to me, and he must be the one to represent me, you know, because there's someone over you and that you work for. So, I really don't understand what is really going on here, anyway, you know." The court explained that if the jury found just one of the special circumstances true, defendant would die in prison whether by a life sentence or by the death penalty. The court cautioned, "So it is in your best interest that you consider very carefully your representation in this matter." The court explained that it was defendant's right to choose Blankenship, and the court would not interfere with defendant's decision. Defendant responded, "You tellin' me that's

23

my decision, but then later on down in trial, you's tellin' me that you have the power to say that this man might not be competent to represent me." The court explained it would not remove Blankenship. Blankenship interjected, "Your Honor, Mr. Woodruff has said—and I know Mr. Woodruff fairly well. He said that he chooses me as his counsel, and that he said that in his mind it's based on his own feelings and beliefs." Defendant agreed. The prosecutor informed defendant that Blankenship's suspension was for incompetence.

The trial court verified that defendant understood that defense funding was available and that a well-trained death penalty lawyer would have applied for funds. The court explained again, "I want you to understand, because ultimately your life is the one that's on the line here, this Court, me, I will, if you ask me to, I will appoint an attorney to represent you for free, who is experienced in this type of defense, a person who has handled death penalty cases in the past and who is intimately familiar with all of the requirements involved in a death penalty case, both in terms of investigation, preparation, the interviewing of witnesses, the conducting of the trial, all the way from jury selection through the penalty phase. And I will do that if you ask me to.

"If you don't ask me to, that's fine. If you want to proceed with Mr. Blankenship, knowing of the concern that I have with respect to his experience . . . . And as Mr. Blankenship has readily acknowledged, his background in criminal law is not extensive. He has had some victories, both in San Diego County and this county, but none of those cases even approach the gravity or seriousness of the case involving you."

Defendant indicated that he understood. The court stated again, "Now, with that in mind, is it your decision, at least at this point, to continue to proceed with Mr. Blankenship representing you?" Defendant responded affirmatively.

24

The trial court vacated the impending trial date, electing to "take a wait-and-see approach" and to monitor defense counsel's progress.

> ii. *Further Hearings Indicating Blankenship's Lack of Preparedness, Defendant's Affirmance of Blankenship as Counsel of Choice, and the Trial Court's Efforts To Ensure Adequate Defense*

At trial readiness conferences in March 2002, Blankenship's lack of preparedness again became evident. The prosecution had not received any defense discovery requests with two weeks remaining before the new trial date. Blankenship needed additional time to procure a ballistics expert, and he also had not filed a *Pitchess* motion discussed several months before. Of most concern, Blankenship had not yet obtained a psychological evaluation of defendant. Despite Blankenship's reassurance, the court determined it would have to postpone the trial by several more weeks and dismiss the 183 jurors who had been time-qualified during two days of jury selection.

The court expressed concern about potentially sentencing to death someone whose trial counsel was unprepared and decided to delay the trial to make sure the defense had sufficient time to prepare. It explained to Blankenship, "I admire your zealousness and your desire to defend this man, . . . but I think you're in over your head here."

Blankenship responded, "My position is that my tactical decisions through the course of this trial regarding the protection of my client and the promotion and preservation of the truth, those decisions that I've made, they may not be perfect and they may be different than what you would do or different than what [prosecutor] Soccio would do . . . ."

The court noted that the defense "probably should" have filed the following motions: a motion attacking the makeup of the grand jury; a motion to challenge the sufficiency of the grand jury testimony, particularly with respect to one of the

25

special circumstance allegations; and a motion for change of venue. Blankenship responded that motions that a court would likely deny are "an exercise in futility."

The prosecutor asked the court to again take a waiver from defendant because of the "appearance of ineffective assistance" and asked the court to appoint experienced counsel to consult with Blankenship and defendant.

The court asked defendant, "Mr. Woodruff, are you comfortable with the way your case is being handled thus far?" Defendant responded, "Yes." The court determined it would not inquire of defendant at the length it had done previously, stating: "Mr. Woodruff has made, in my estimation, a sound and informed decision to continue on with counsel of his choice, and I cannot conclude that there has been ineffective assistance at this point."

The court concluded, "There's no question in my mind that the representation being provided thus far to Mr. Woodruff is zealous and, thus far, within the bounds of the law." The court stated further, "In examining the history of this case, the Court feels that there may well be sound, tactical reasons behind the failure to pursue certain motions, such as those I referred to earlier this morning. . . . All of these, in my opinion, had such motions been brought they would have been denied.

"And taking Mr. Blankenship at his word, he may very well have had a sound, tactical reason and may have concluded legally . . . that such motions would have been fruitless." The court noted, however, that there was "no sound, tactical" reason for failing to make a *Pitchess* motion and "strongly suggest[ed]" that Blankenship do so. Blankenship agreed and the court set a hearing date.

Although Blankenship filed the *Pitchess* motion, the trial court found it to be defective, and after providing several opportunities, denied the final motion for failure to cure the defect. The court concluded that Blankenship's performance,

while poor, did not rise to the level of "flagrant ineffective assistance," but that if it were to do so in the future, the court would not hesitate to remove Blankenship.

### b. Analysis

#### i. No Error in Allowing Blankenship To Represent Defendant

Defendant contends the trial court failed to intervene and remove Blankenship when the prosecutor raised doubts about Blankenship's competence to provide adequate representation in defendant's capital trial. The trial court did not err.

The Sixth Amendment right to counsel guarantees a criminal defendant the right to choose his own counsel when he does not need appointed counsel. (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144.) While a defendant has a constitutional right to competent representation, he also has the right to counsel of his choice so that he may defend himself in " 'whatever manner he deems best.' " (*Smith v. Superior Court*, *supra*, 68 Cal.2d at p. 559.)

"California decisions in this area reflect a determination that respect for the dignity of the individual shall be maintained within the context of enforcing the criminal law, and that a reasonable accommodation of seemingly conflicting values shall thereby be achieved. Thus, though it is clear that a defendant has no *absolute* right to be represented by a particular attorney, still the courts should make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney." (*People v. Crovedi* (1966) 65 Cal.2d 199, 207, fn. omitted.) The erroneous deprivation of a defendant's right to counsel of his choice results in automatic reversal. (*United States v. Gonzalez-Lopez, supra,* 548 U.S. at p. 150; *People v. Ramirez* (2006) 39 Cal.4th 398, 422.)

27

In *People v. Ramirez, supra,* 39 Cal.4th at pages 419 to 422, the defendant contended that the trial court erred in granting his request for substitution of counsel despite the court's concerns that his two chosen counsel were unqualified to try a capital case. Concluding there was no error, we explained that a trial court can deny a defendant counsel of his choice only if it " ' "will result in significant prejudice to the defendant." ' " (*Id.* at pp. 422-423.)

In *Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 613, where the question was under what circumstances a defendant could demand deficient counsel, we concluded that "[w]hile … the right to chosen counsel is not absolute [California decisions] limit severely the judge's discretion to intrude on defendant's choice of counsel in order to eliminate potential conflicts, ensure adequate representation, or serve judicial convenience." We explained that while a defendant has a constitutional guarantee to effective counsel, that effectiveness is "linked closely to representation by counsel of choice. When clients and lawyers lack rapport and mutual confidence the quality of representation may be so undermined as to render it an empty formality." (*Ibid.*; see *Smith*, *supra*, 68 Cal.2d at pp. 561 [the attorney-client relationship is "particularly essential" when defending the client's life].)

In *Smith*, the issue concerned whether a trial court could remove an indigent defendant's attorney based on "the judge's subjective opinion that the attorney [was] 'incompetent' . . . ." (*Smith*, *supra*, 68 Cal.2d at p. 549.) We explained that "the constitutional guarantee of the defendant's right to counsel requires that his advocate . . . be free in all cases of the threat that he may be summarily relieved as 'incompetent' by the very trial judge he is duty-bound to attempt to convince of the rightness of his client's cause." (*Id*. at p. 562.) While "it is the duty of the trial judge to protect the defendant's right to a counsel who is *effective* . . . in discharging that duty the judge must be on his guard neither to

28

infringe upon the defendant's right to counsel of his choice, nor to compromise the independence of the bar." (*Id.* at p. 559.)

We explained that a trial court has several measures available "when it appears to him that a defense counsel is making serious mistakes to his client's prejudice." (*Smith*, *supra*, 68 Cal.2d at p. 560*.*) The "judge may intervene, at least within reasonable limits," such as by "controlling the scope of examination, questioning witnesses himself, making appropriate suggestions as to the items or order of proof, commenting on the evidence, admonishing or instructing the jury on his own motion, or exercising any of his other inherent powers over the conduct of the proceedings to insure that the defendant receives a fair trial." (*Ibid.*)

Nonetheless, "[w]hile we recognize that courts should exercise their power to remove defense counsel with great circumspection," a trial court has a duty to remove counsel even over the defendant's objection where other measures have failed, in cases of " 'obviously deficient performance' " such as when counsel refuses to participate in the trial. (*People v. McKenzie* (1983) 34 Cal.3d 616, 630.)

Here, the trial court relied on *Smith* in declining to relieve Blankenship. The court took the approach endorsed in *Smith*, intervening when it observed that Blankenship's actions or omissions could potentially harm defendant. For instance, the court provided guidance to Blankenship about applying for defense funds and urged him to do so, and afforded repeated opportunities and instruction on how to file a sufficient *Pitchess* motion. The court also delayed the trial for a year through several continuances to allow Blankenship time to prepare. (Cf. *People v. Crovedi, supra,* 65 Cal.2d at pp. 208-209 [court reasonably delayed trial by several weeks to allow a defendant to keep his retained counsel and have time to prepare].) As a result, Blankenship did retain a psychologist to examine defendant and arranged for further testing to support the defense theory that

29

defendant had an intellectual disability and a brain injury. The court also intervened at times during the trial, for example by admonishing the jury that it was not to consider a witness's opinion as to guilt when Blankenship elicited a prosecution investigator's opinion that defendant was guilty.

Given the court's twin duties as outlined in *Smith*—to protect defendant's right to effective assistance as well as his right to chosen counsel (*Smith, supra,* 68 Cal.2d at pp. 558-562)—and given defendant's repeated affirmance of Blankenship as his choice of counsel, the court's approach was reasonable.

Moreover, it is evident from the record that Blankenship never relinquished his responsibility to represent defendant and instead actively litigated issues and examined witnesses on defendant's behalf throughout the trial. As Blankenship explained at the September 2001 and March 2002 hearings, his approach was not to rely on motions that he felt would telegraph the defense strategy, but instead to try the case in front of the jury and allow it to determine the strength of the evidence. Blankenship's actions throughout the trial reflected his stated strategy of presenting this case as a Riverside community issue involving minorities and law enforcement. For example, during jury selection, Blankenship questioned potential jurors about their sensitivity to racial injustice and their knowledge of the Tyisha Miller shooting. Blankenship's examination of defendant and Carr at trial similarly demonstrated this approach by highlighting the family's earlier experiences with law enforcement as well as their familiarity with the Tyisha Miller shooting.

Thus, Blankenship actively defended defendant with a strategy we cannot say was unreasonable, given the evidence in the case and the events taking place in the Riverside community at the time. "Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness

examination and jury argument." (*United States v. Gonzalez-Lopez, supra,* 548 U.S. at p. 150.) We also note that Blankenship endeavored to work with the court to meet its concerns and the court accepted his explanations as to his actions. We cannot say Blankenship's decisions rose to the level of " 'flagrant circumstances of attorney misconduct or incompetence when all other judicial controls have failed.' " (*Maxwell v. Superior Court*, *supra*, 30 Cal.3d at p. 615, quoting *Cannon v. Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 697.) Rather, Blankenship's decisions fall into the realm of tactical choices by the defense with which the court could not properly interfere. When Blankenship did make mistakes, such as the failure to arrange for expert evaluations in a timely manner, the trial court mitigated the harm by delaying the trial.

Defendant asserts the trial court was unaware it possessed the discretion to remove Blankenship for incompetence. However, the court stated just the opposite, acknowledging that "[t]he narrow circumstances in which removal may occur are flagrant attorney misconduct or incompetent attorney, incapacity, significant[] prejudice to the defendant, or serious circumstances that undermine the integrity of the judicial process or orderly administration of judicial process." Aware of this discretion, however, the trial court concluded, "There's no question in my mind that the representation being provided thus far to Mr. Woodruff is zealous and, thus far, within the bounds of the law." At a later hearing, the court said it would not hesitate to remove Blankenship if he reached a standard of "flagrant ineffective assistance."

The trial court's "wait-and-see" approach, coupled with active intervention when concerns arose, struck the right balance in protecting defendant's dual rights to effective assistance of counsel and to defend himself in " 'whatever manner he deems best.' " (*Smith*, *supra*, 68 Cal.2d at p. 559.)

31

### ii. The Inquiry into Defendant's Choice of Counsel was Sufficient

Defendant also challenges the court's inquiry into his choice of Blankenship as his counsel. Specifically, defendant contends that the trial judge did not make adequate inquiry "into the defendant's comprehension of his constitutional rights and how defense counsel's actions were jeopardizing them," and "did not actually ask Mr. Woodruff to waive his right to effective assistance." The trial court did not err.

"[T]the right to counsel can be waived only if such waiver is knowing, intelligent and voluntary." (*People v. McKenzie*, *supra*, 34 Cal.3d at p. 635.) When posed with the claim that a defendant had "impliedly waived his right to *effective* assistance of counsel," we explained that " 'The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer.' " (*Id.* at p. 636.) On the question of when a defendant may demand deficient counsel, where the issue concerns a conflict, we explained that when "the danger of proceeding with chosen counsel has been disclosed generally to defendant, he may insist on retaining his attorney[] if he waives the conflict knowingly and intelligently for purposes of the criminal trial." (*Maxwell v. Superior Court*, *supra*, 30 Cal.3d at p. 619.) If "an adequate waiver of defendant's effective-assistance rights cannot be obtained on the record, the court must presume that he has not knowingly and intelligently chosen to proceed with retained counsel. [Citation.] The court may then protect the record and defendant's right to effective assistance by requiring counsel's withdrawal." (*Id.* at p. 620.)

At the September 2001 hearing, the trial court inquired of defendant whether he wished to proceed with Blankenship as his attorney, urging him to "consider very carefully your representation," given the possibility of a death

32

sentence. The court sought to ensure that defendant was making an informed decision to retain Blankenship by describing its concerns about Blankenship's limited experience and his failure to take certain actions in the case, and verifying that defendant nonetheless wished to continue with Blankenship. The court discussed its concerns about Blankenship's failure to apply for defense funds carefully and at length. Defendant participated in the discussion, offering comments and asking questions when he did not understand, and the court provided further clarification. The court also explained at length that he had the right to an attorney at no cost and that the court would appoint a public defender experienced in capital cases if defendant wished and verified that defendant understood.[4]

Every time the court asked defendant whether he wanted to proceed with Blankenship as his counsel, defendant responded affirmatively, even reassuring the judge that Blankenship "must be the one to represent me" and obtaining confirmation that the court would not later override defendant's decision. Defendant indicated that he understood the court's concerns about Blankenship. Defendant sought further assurance from the trial judge that the judge would remain assigned to the case, finally telling the court, "Well, I'm satisfied."

Thus, the court took the time to inform defendant of his right to counsel and of its concerns regarding Blankenship's lack of experience and lack of preparation, and cautioned defendant to think carefully about his choice of counsel given the serious consequences he faced. Given that the trial court did not find Blankenship to be ineffective, defendant's argument about the failure to take a "waiver" of effective assistance is misplaced. In response to concerns the prosecution raised

---

[4] A few days after defendant's arrest, the court had advised defendant of his right to an attorney. Defendant asked for and was appointed a public defender that day.

33

regarding Blankenship, the court sought to affirmatively ensure that defendant was making an informed decision in his choice of counsel, as was his right.

At the hearing in March 2002, when the court determined that Blankenship was again unprepared for trial, the court asked and received an affirmative response from defendant to the question, "Mr. Woodruff, are you comfortable with the way your case is being handled thus far?" Concluding defendant had made "a sound and informed decision to continue" with Blankenship, the court reasonably elected not to question him to the extent it had at the September hearing; further inquiry could have been viewed as interference with defendant's right to counsel of his choice. "We observed in *Maxwell v. Superior Court*[, *supra*,] 30 Cal.3d [at p. 615,] . . . '[d]efendant's confidence in his lawyer is vital to his defense. His right to decide for himself who best can conduct the case must be respected wherever feasible.' " (*People v. Ramirez*, *supra*, 39 Cal.4th at p. 422.)

The court again concluded Blankenship had not provided ineffective assistance "at this point." It noted areas where it had concerns about Blankenship's representation of defendant, but also found that Blankenship had "sound, tactical reasons" for his decision not to file or pursue certain motions. Thus, the circumstance did not call for taking a "waiver" of effective assistance of counsel.

Further, defendant's repeated affirmative choice of Blankenship as his trial counsel has not prevented him from raising ineffective assistance in support of various claims in his appeal. "A defendant whose request to substitute counsel is granted cannot complain on appeal that the trial court should have denied that request. The defendant's only contention on appeal in such circumstances can be that he or she was denied effective assistance of counsel." (*People v. Ramirez*, *supra*, 39 Cal.4th at p. 423; see *Wheat v. United States* (1988) 486 U.S. 153, 162 ["we note . . . the apparent willingness of Courts of Appeals to entertain

34

ineffective-assistance claims from defendants who have specifically waived the right to conflict-free counsel"].)

Defendant further contends that the court erred in making no attempt to determine his "mental ability to knowingly and intelligently waive his rights . . . ." However, as noted in section II.A., *ante*, the record does not indicate that defendant was incompetent to stand trial, and nothing in his colloquy with the court suggests he lacked the mental capacity to make an informed decision to continue with Blankenship.

Therefore, the trial court's inquiry into defendant's knowledge of his right to counsel and his decision to proceed with his chosen counsel did not fall short of any requirement in the circumstances.

### 2. *Availability of Appointment of Cocounsel*

As explained in *Keenan v. Superior Court* (1982) 31 Cal.3d 424, 429, a trial court has discretion under section 987 to appoint cocounsel to the defense in a capital case. Defendant claims the trial court abused its discretion when it "misled the inexperienced defense attorney into thinking he had a high threshold for obtaining" cocounsel. Defendant also contends Blankenship was prejudicially ineffective in failing to request the appointment of second counsel.

### a. *Factual Background*

At a hearing in March 2001, the prosecution inquired whether Blankenship would request appointment of *Keenan* counsel since there were indications that defendant did not have funds for a private attorney. The court stated that it would "consider anything you wish to bring to my attention." *Keenan* counsel was a "novel" concept to Blankenship. The court explained, "I'm sure once you conduct your evaluation you'll discover that the justification for appointing second counsel—or as it's referred to, *Keenan* counsel, is limited to some rather narrowly

35

defined situations, particularly regarding the complexity of the case, the types of issues that will be raised during the course of the case, and various related factors. So once you've had a chance to evaluate that, by all means bring it to my attention."

When Blankenship raised the prospect of *Keenan* counsel at the September 2001 hearing, the trial court noted uncertainty about whether it could appoint second counsel in the current situation, stating: "Well, there's a question in my mind about that. Now, *Keenan* counsel, in certain circumstances, can be appointed, assuming the appropriate procedures regarding the request for second counsel are complied with. But . . . the *Keenan* case itself involved appointed first counsel, and in virtually every situation I have seen that is the case. Appointed counsel makes the request for a second appointed counsel and, you know, that's how it goes. . . . [M]y question to you, . . . very simply stated, is whether the *Keenan* case allows for appointment of second counsel in a situation where first counsel is not appointed but rather retained." The court also observed that it might become necessary for Blankenship to brief this question.

Blankenship responded that he had received a lot of inquiries about offers to assist the defense, so he felt "certain" he would be able to bring in another attorney to serve pro bono.

### b. Analysis

#### i. The Trial Court Did Not Discourage Defense Counsel from Seeking Appointment of Cocounsel

Section 987, subdivision (d), provides that in a capital case, a trial court "may appoint an additional attorney as a cocounsel upon a written request of the first attorney appointed. The request shall be supported by an affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed. . . . The court shall appoint a second attorney when it is convinced by

the reasons stated in the affidavit that the appointment is necessary to provide the defendant with effective representation.  If the request is denied, the court shall state on the record its reasons for denial of the request."  "The initial burden . . . is on the defendant to present a specific factual showing as to why the appointment of a second attorney is necessary to his defense against the capital charges."  (*People v. Lucky* (1988) 45 Cal.3d 259, 279.)  "The appointment of a second counsel in a capital case is not an absolute right protected by either the state or the federal Constitution."  (*People v. Clark* (1993) 5 Cal.4th 950, 997, fn. 22.)  We review a decision denying the appointment of second counsel for abuse of discretion.  (*People v. Verdugo* (2010) 50 Cal.4th 263, 278.)

Defendant asserts the trial court "discouraged" Blankenship from seeking appointment of second counsel.  On the contrary, the court stated it would "consider anything you wish to bring to my attention," with regard to a *Keenan* appointment.  Moreover, in response to Blankenship's comment that *Keenan* counsel was a "novel" concept to him, the court helpfully responded that once Blankenship had a chance to consider the matter, he would learn the requirements for the appointment of second counsel, stating generally the criteria to be "the complexity of the case, the types of issues that will be raised during the course of the case, and various related factors."  (See *Keenan v. Superior Court*, *supra*, 31 Cal.3d at p. 432 [When assessing the need for another attorney, the court "must focus on the complexity of the issues involved, keeping in mind the critical role that pretrial preparation may play in the eventual outcome of the prosecution."].)  Therefore, rather than discouraging Blankenship from applying for cocounsel, the court seemed to encourage him.

Further, the statute providing for the appointment of second counsel states that it may be available "upon a written request of the first attorney *appointed*."  (§ 987, subd. (d).)  Thus, the trial court reasonably questioned whether it could

37

appoint second counsel where defendant had privately retained his attorney and simply suggested to Blankenship that he might need to brief the issue. (See *People v. Verdugo*, *supra*, 50 Cal.4th at p. 278 [finding no error in the trial court's denial of an application for appointment of second counsel, "[e]ven assuming without deciding" that the court could appoint second counsel where the first counsel was privately retained]; *People v. Carrasco* (2014) 59 Cal.4th 924, 954 [noting that section 987 states that cocounsel can be appointed on the request of the "first attorney *appointed*"].)

Moreover, since defendant never filed an application for cocounsel, as section 987 requires, there is no decision to review. " '[T]he trial court lacks any specific authority to appoint a second attorney in the absence of a request from the first attorney and the making of a factual record sufficient to support such an appointment. To the extent that defendant's argument is that the trial courts have inherent power to appoint a second attorney, no authority supporting that proposition is cited.' " (*People v. Cunningham* (2015) 61 Cal.4th 609, 667.) Assuming, arguendo, that the court discouraged defense counsel, counsel still had to apply for cocounsel to preserve the court's decision for review.

### ii. Defense Counsel Was Not Ineffective in Failing To Request Cocounsel.

Defendant also contends Blankenship rendered ineffective assistance by failing to apply for cocounsel.

"[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance." (*People v. Alexander* (2010) 49 Cal.4th 846, 888, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687.) Rarely is ineffective

38

assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons for action or inaction. (E.g., *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 265-268.)

The record does not show that Blankenship provided ineffective assistance in failing to request appointment of second counsel. Defendant contends "it would have been an abuse of discretion [for the court] not to appoint second counsel for Mr. Woodruff because of the inexperience of defense counsel, who was totally unfamiliar with capital trial procedure . . . ." However, it was defendant's repeated choice to remain with Blankenship despite the court's warning about Blankenship's lack of experience. Thus, given defendant's choice, Blankenship's lack of experience did not provide grounds for appointment of second counsel. (See *People v. Lancaster* (2007) 41 Cal.4th 50, 62-64, 71-73 [rejecting capital defendant's claim of abuse of discretion in denying appointment of second counsel where counsel retained by defendant and serving pro bono was inexperienced and unprepared].)

Defendant also contends it would have been an abuse of discretion not to appoint second counsel given "the complexity of the issues, which included scientific testimony to mental retardation[5] and brain injury, as well as other criminal acts alleged as aggravating factors at the penalty phase." On the contrary, the trial court would have been within its discretion to deny an application for second counsel based on this bare assertion of complexity. "An 'abstract assertion' regarding the burden on defense counsel 'cannot be used as a substitute for a showing of genuine need.' " (*People v. Staten* (2000) 24 Cal.4th 434, 447;

---

[5] This opinion uses the term "intellectually disabled" in accordance with current terminology except when quoting from the source. (See Stats. 2012, ch. 448 [revising various statutes to replace the term "mental retardation" with the term "intellectual disability"].)

39

see *People v. Jackson* (1980) 28 Cal.3d 264, 287 [no abuse of discretion where denied application for cocounsel made no "factual assertions," instead relying generally on the " 'circumstances surrounding the case' "]; *People v. Verdugo*, *supra*, 50 Cal.4th at p. 278 [application for second counsel insufficient because "unlike in *Keenan,* on which defendant relies, counsel did not state that he needed to interview more than 100 witnesses, that the case involved complicated scientific and psychiatric testimony, that trial would occur soon after counsel was appointed, or that other criminal cases were pending against defendant and that the prosecution intended to rely on evidence related to those cases here"].)

"In any event, because the claim is presented as one of ineffective assistance of counsel, relief depends solely on whether counsel's error, if any, may have affected the outcome." (*People v. Webster* (1991) 54 Cal.3d 411, 437.) Defendant does not explain how any failure to obtain cocounsel prejudiced him, only summarily stating, "In failing to make the request anyway, defense counsel provided prejudicially ineffective assistance." Regardless, as discussed in section II.B.1., *ante*, the trial court monitored the case and protected defendant's rights, for example, by delaying the trial by several months so that Blankenship would have sufficient time to prepare. The record does not suggest that a more favorable result was reasonably probable but for the failure to request cocounsel.

### 3. *Adequacy of Defendant's Waivers of Right to Conflict-free Counsel*

Finally, defendant contends that the trial court erred in "solicit[ing] three pretrial waivers of [the] right to unconflicted counsel without showing defendant made [a] knowing, intelligent and voluntary choice," and that Blankenship violated his duty of loyalty. Defendant contends that Blankenship's conflicts "adversely affected" his performance. (*Cuyler v. Sullivan* (1980) 446 U.S. 335, 348.) Defendant fails to show that Blankenship's representation was ineffective.

*a. Factual Background*

Defendant waived his right to conflict-free counsel on three occasions. First, defendant waived the right with respect to Blankenship's recent representation of his mother, Carr, on charges of misdemeanor disturbing the peace and resisting arrest stemming from the same event. The court explained to defendant that "it is possible . . . some evidence that may have been produced during the course of [Carr's] trial . . . would be in conflict, or against your best interests." Defendant indicated he understood. The court explained further that defendant would have to waive any conflict of interest in Blankenship's representation of his mother. Defendant indicated he was willing to waive the potential conflict and that he was "satisfied with Blankenship."

The second and third waivers concerned Blankenship's former representation of defendant's cousin, Dennis Smith, whom the prosecution expected to testify at the penalty phase and potentially at the guilt phase to impeach defendant. Blankenship had represented Smith on an unrelated matter and stated he had no confidential information that would benefit defendant. The court surmised that conflict was unlikely but sought to protect both Smith's and defendant's rights. Noting that Smith's testimony would be incriminating to defendant and would potentially result in an aggravated sentence, the court explained at length to defendant that Blankenship would have limited ability to impeach Smith with Smith's prior criminal conduct because of Smith's right to attorney-client confidentiality. The court explained, "If someone else was representing you, someone who had absolutely no connection with Mr. Smith over here, . . . that attorney . . . [could] inquire to his heart's content about information that was exchanged between Mr. Smith and someone else, . . . without fear of any conflict of interest, without fear of any attorney-client privilege." Defendant

41

indicated that he understood and nonetheless wished to proceed with Blankenship, and on both occasions, waived any potential conflict of interest.

The prosecution expected Smith to testify at the penalty phase about an earlier incident at a liquor store, in which he would implicate defendant in a shooting. Blankenship had no confidential information about the incident. The court said that the defense could question Smith about whether he had had a felony conviction involving moral turpitude but would disallow inquiry into the underlying facts of the conviction.

*b. Analysis*

A defendant's Sixth Amendment guarantee to effective assistance of counsel includes the right to counsel free from conflicts of interest. (*Wood v. Georgia* (1981) 450 U.S. 261, 271; *People v. Doolin* (2009) 45 Cal.4th 390, 411.) "Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client . . . ." (*People v. Bonin* (1989) 47 Cal.3d 808, 835, citing ABA Model Rules Prof. Conduct, rule 1.7 and com. thereto.) "Conflicts may also arise in situations in which an attorney represents a defendant in a criminal matter and currently has or formerly had an attorney-client relationship with a person who is a witness in that matter." (*People v. Bonin*, *supra*, 47 Cal.3d at p. 835.)

Assuming without deciding that Blankenship had a conflict of interest that defendant did not validly waive, we do not find that his representation was ineffective. A claim of ineffective assistance of counsel requires a defendant to establish that counsel's performance was deficient and that absent those deficiencies it is reasonably probable the outcome would have been more favorable to him. " 'Hence, to obtain reversal of a criminal verdict, the defendant must demonstrate that (1) counsel labored under an actual conflict of interest that

42

adversely affected counsel's performance, and (2) absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different.' " (*People v. Rices* (2017) 4 Cal.5th 49, 65.)

"Determining 'whether counsel's performance was "adversely affected" . . . "requires an inquiry into whether counsel 'pulled his punches,' i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission." [Citation.]' " (*People v. Rices, supra,* 4 Cal.5th at p. 65.)

Here, the record does not indicate that Blankenship "pulled his punches" in questioning either defendant's mother or his cousin. Although called as a prosecution witness, Carr's testimony supported the defense's case that the family was afraid and distrustful of the police and that defendant was afraid the police were hurting his mother that day. Blankenship cross-examined Carr thoroughly on various topics, including earlier encounters with the police, her knowledge of the Tyisha Miller shooting, her fear of the police, and her recollection of the events that day, including her perception that Baker appeared angry and had aimed a gun at Claude. Blankenship asked her repeatedly about whether she was screaming and crying and afraid, which would have supported defendant's testimony that he reacted because he heard his mother screaming. Carr's testimony was therefore helpful to the defense, and Blankenship would not have needed to impeach Carr with any confidential information.

Smith testified briefly at the penalty phase about the liquor store shooting but, contrary to the prosecution's expectation, he minimized defendant's involvement, stating that he did not see defendant with a gun. Thus, Blankenship likely realized it was not in defendant's interest to impeach Smith, since his testimony indicated defendant had not been involved in the shooting. Suggesting that Smith had a tendency for untruthfulness would have cast doubt on his testimony that defendant was not involved. Blankenship stated in his penalty phase closing argument that the prosecution's evidence at most implicated defendant as being present at the liquor store incident, which indicates his strategy was to use Smith's testimony at face value rather than to impeach it. Thus, there is nothing to suggest that Blankenship "pulled his punches" with respect to either witness.

Because Blankenship's performance was not deficient, we need not reach the second prong of the *Strickland* test, i.e., whether counsel's performance affected the outcome. Defendant offers no argument supporting the claim that Blankenship's deficient performance impacted the guilt or penalty verdicts.

Finally, defendant asserts that Blankenship labored under actual conflicts with respect to defendant's six-year-old daughter as well as his brother Claude Carr, as evidenced by comments Blankenship made about the possibility of sparing defendant's daughter from testifying as a prosecution witness and about potentially merging defendant's trial with Claude's. An attorney labors under an actual conflict of interest when he "fail[s] to represent defendant as vigorously as he might have, had there been no conflict." (*People v. Cox* (2003) 30 Cal.4th 916, 948.) Based on these brief inquiries, we discern no potential for conflict. Blankenship did not represent defendant's daughter or Claude. Blankenship may have had tactical reasons for his queries or may have been responding to an instruction from defendant to spare his daughter the trauma of testifying.

44

## C.  Jury Selection Issues

### 1.  *Exclusion of Prospective Juror Based on Written Questionnaire*

Defendant contends the trial court, over defense objection, erroneously excused for cause two prospective jurors, W.C. and D.K., based solely on their written responses to questions about their views on capital punishment.  We conclude the trial court erred in excusing D.K. based on his questionnaire responses, requiring reversal of the penalty verdict.  We thus need not reach defendant's claim regarding W.C.

The prosecution challenged for cause prospective juror D.K. based on his responses to the questionnaire.  The defense would not stipulate to his removal.  The trial court denied the prosecution's challenge, explaining, "He's pretty strong here.  He doesn't believe in the death penalty.  He rates himself a one.  He does state in 55-C he would consider all the evidence.  However, the reason I am not gonna grant your challenge at this point is his response to 53-C where he says it would not—Because he's against the death penalty, his opinion would not make it difficult to vote for the death penalty.  He would follow the law.  So, I think that needs to be explored."

On further argument by the prosecutor, the trial court responded, "But what harm what do we lose if he comes in here and you question him further on this, and if his answers don't change I grant the challenge for cause?"  The prosecution articulated the suspicion that the reason for the court's refusal to grant the challenge as to D.K. was because he was African-American.  The court had previously stated concern "about the relatively small number of African-Americans here."

Regarding his general feelings about the death penalty, D.K. wrote in his questionnaire, "I don't believe in death penalty," and on a scale of 1 to 10, circled 1, which corresponded to being "strongly against" the death penalty.  (Circling 10

indicated being "strongly in favor of the death penalty.")  D.K. explained, "Men are equals only God can make those choices."  However, D.K. checked "no" to the question whether his opinion would make it difficult to vote for the death penalty regardless of the evidence, explaining in his own words, "I would followed the law."  D.K. responded "none" to the questions asking what purpose he thought the death penalty served and what impressions he had of life in prison without parole as a punishment for murder.  On question 55, which asked whether he would "ALWAYS" vote for the death penalty, or "ALWAYS" vote for life without parole, or consider all the evidence and instructions and impose the penalty he personally felt appropriate, D.K. checked the last response.[6]

The prosecution later filed a written motion asking the court to reconsider its rulings denying the prosecutor's request to remove three prospective jurors for cause, including D.K., based on their written responses, reiterating the concern that the court's decision was based in part on the impermissible factor of race.

---

[6]     The full question read as follows:  "It is important that you have the ability to approach this case with an open mind and a willingness to fairly consider whatever evidence is presented as opposed to having such strongly held opinions that you would be unable to fairly consider all the evidence presented during the penalty phase.  [¶] There are no circumstances under which a jury is instructed by the court that they must return a verdict of death.  No matter what the evidence shows, the jury is always given the option in a penalty phase of choosing life without the possibility of parole.  Assuming a defendant was convicted of a special circumstance murder, would you:
__ a. No matter what the evidence was, ALWAYS vote for the death penalty.
__ b. No matter what the evidence was, ALWAYS vote for life without possibility of parole.
__ c. I would consider all of the evidence and the jury instructions as provided by the court and impose the penalty I personally feel is appropriate."

At the hearing on the motion, the defense asserted that the prosecution would have "plenty of opportunity during voir dire to determine whether or not the answers, indeed, were trustworthy," and that "the word 'believe' and all those things are talked about in a vacuum. They are talked about in advance of hearing and seeing evidence. They are—they are certainly not bright lines that would deprive anyone of the right to serve on a jury." The defense explained that it might advance a *Wheeler* motion based in part on the prosecution's challenges.[7] The prosecution acknowledged that the defense was correct about the voir dire process but that the court had not used the same standard in excusing for cause prospective jurors of different races.

The trial court granted the motion as to W.C. and D.K., explaining it had reconsidered the responses and determined that "there is not even a theoretical possibility of evidence that would allow them to vote for the death penalty . . . ."

The next day, the defense added that the prosecution motion did not include the information that D.K. had written in his questionnaire that he would follow the law. The court explained that D.K.'s "statements otherwise in the questionnaire make it clear to me . . . that there was no reasonable possibility he would vote for the death penalty if placed in the position of having to do so."

A prospective juror may be excused for cause due to that juror's views on the death penalty only when those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424.) " 'Prospective jurors may be dismissed based on written questionnaire responses alone if the responses leave no doubt that their views on capital punishment would prevent or substantially impair the performance of their duties in accordance with the court's instructions

---

[7]    *People v. Wheeler* (1978) 22 Cal.3d 258; see *Batson v. Kentucky* (1986) 479 U.S. 79.

and the jurors' oath.  [Citation.]  By contrast, if a juror's questionnaire responses are inconsistent and do not clearly reveal an inability to serve, the court may not grant a cause challenge without further questioning to clarify the juror's views.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 863.)

"When the trial court's assessment of a prospective juror's capacity to serve is based at least in part on the juror's tone, demeanor, or other elements that cannot be reflected in the written record, its ruling is owed deference by reviewing courts.  [Citation.]  But no such deference is warranted when a trial court's ruling on a for-cause challenge is based solely on the prospective jurors' answers to a written questionnaire.  [Citation.]  In those circumstances, we review de novo the trial court's dismissal of the prospective juror for cause." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 37.)

"[A] prospective juror may not be excluded for cause simply because his or her conscientious views relating to the death penalty would lead the juror to impose a higher threshold before concluding that the death penalty is appropriate or because such views would make it very difficult for the juror ever to impose the death penalty.  Because the California death penalty sentencing process contemplates that jurors will take into account their own values in determining whether aggravating factors outweigh mitigating factors such that the death penalty is warranted, the circumstance that a juror's conscientious opinions or beliefs concerning the death penalty would make it very difficult for the juror ever to impose the death penalty is not equivalent to a determination that such beliefs will 'substantially impair the performance of his [or her] duties as a juror' . . . ." (*People v. Stewart* (2004) 33 Cal.4th 425, 447.)

Even if a juror checked the box indicating that it would be "very difficult" for him or her to impose the death penalty, the juror might nonetheless, "in response to brief follow-up questioning, persuasively demonstrate an ability to put

48

aside personal reservations, properly weigh and consider the aggravating and mitigating evidence, and make that very difficult determination concerning the appropriateness of a death sentence. Such a prospective juror would not be substantially impaired in performing his or her duties as a juror." (*People v. Stewart*, *supra*, 33 Cal.4th at p. 447.)

Reviewing the decision to remove D.K. independently, we conclude the trial court erred in sustaining the challenge for cause based on the juror's written questionnaire responses. Simply because he did not "believe" in the death penalty, it does not follow that D.K. would have been unable to "put aside personal reservations, properly weigh and consider the aggravating and mitigating evidence, and make that very difficult determination concerning the appropriateness of a death sentence." (*People v. Stewart*, *supra*, 33 Cal.4th at p. 447.)

Despite his beliefs, D.K., in response to question 55, which asked whether he would *always* vote for the death penalty, *always* vote for life without parole, or consider all the evidence and instruction and impose the penalty he felt appropriate, chose the third option. Additionally, he responded "yes" to the question whether, if the judge gave an instruction on the law that differed from his beliefs or opinions, he would follow the law as instructed by the judge. D.K.'s responses thus "did not clearly demonstrate that his death penalty views would prevent or substantially impair the performance of his duties as a capital juror." (*People v. Covarrubias, supra,* 1 Cal.5th at p. 866.)

D.K.'s responses provide little ambiguity as to his ability to set aside his beliefs and follow the law. In response to the question whether his beliefs (which included that "only God can make those choices") would make it difficult to vote for the death penalty, D.K. responded "*No*," explaining, "I would follow[] the law." Thus, D.K.'s written response did not support the trial court's conclusion.

"Those who firmly oppose the death penalty may nevertheless serve as jurors in a capital case as long as they state clearly that they are willing to temporarily set aside their own beliefs and follow the law." (*People v. Avila* (2006) 38 Cal.4th 491, 529.) Here, in his own words, D.K. expressly stated that he would "follow[] the law." These views, including the pledge to follow the law, do not demonstrate a substantial impairment in his ability to serve as a juror.

The parties could have, and should have, examined D.K.'s responses further through voir dire. As the trial court noted in its initial decision to deny the challenge for cause, D.K.'s response that he would follow the law "need[ed] to be explored" and there was nothing to be lost by questioning him in voir dire.

"We simply do not know how [this] potential juror[] would have responded to appropriate clarifying questions posed to [him] by the trial court. Had the trial court conducted a follow-up examination of [D.K.] and thereafter determined (in light of the questionnaire responses, oral responses, and its own assessment of demeanor and credibility) that the prospective juror's views would substantially impair the performance of his . . . duties as a juror in this case, the court's determination would have been entitled to deference." (*People v. Stewart*, *supra*, 33 Cal.4th at pp. 450-451.)

"[U]nder existing United States Supreme Court precedent, the erroneous excusal of a prospective juror for cause based on that person's views concerning the death penalty *automatically* compels the reversal of the penalty phase without any inquiry as to whether the error actually prejudiced defendant's penalty determination." (*People v. Riccardi* (2012) 54 Cal.4th 758, 783, citing *Gray v. Mississippi* (1987) 481 U.S. 648.) Accordingly, "[u]nder compulsion of *Gray*, we reverse defendant's penalty phase verdict." (*Riccardi*, at p. 783)

## 2. *Assertedly Biased Juror*

We address defendant's remaining claims of error concerning jury selection since they may affect the validity of the guilt verdict. The court seated Juror No. 3 over the *prosecutor's* challenge for cause. Based on Juror No. 3's responses in his written questionnaire and in voir dire, defendant asserts that the juror was biased, and thus the trial court erred in seating him and defense counsel was ineffective for failing to make a for-cause challenge and instead opposing it. Regardless of how defendant frames the claim, we find no error.[8]

Juror No. 3, a 31-year-old African-American man, stated in his jury questionnaire that the nature of the charges would make it "[d]ifficult to be fair" because his mother and uncle were peace officers. However, he stated that he would not credit the testimony of a witness simply because the witness is a law enforcement officer. Juror No. 3 stated he would follow the law where it differed from his opinions and would require the prosecutor to prove guilt beyond a reasonable doubt. In his other responses, Juror No. 3 indicated he could listen to fellow jurors and receive the benefit of their thinking. Juror No. 3, a former Marine, had grown up in Alabama.

Both parties questioned Juror No. 3 at voir dire. The juror explained that his mother's status as a correctional officer, and the subject matter of the case, would cause him to "be strongly on the side of [defendant] being guilty." However, he stated he would "evaluate options before making conclusions," and affirmed his duty to be "open-minded and listen[] to all the evidence." The juror stated more than once that he would "try to be fair and impartial" but expressed uncertainty about his ability to do so. Defense counsel briefly questioned Juror No. 3 about growing up in Alabama.

---

[8] Because we conclude there is reversible *Witt* error, we do not review defendant's contention that Juror No. 3 had penalty bias.

The prosecution "hesitatingly" submitted Juror No. 3 for challenge to "see if the court thought he could or could not be fair" to the defense. Defense counsel opposed the challenge, citing the juror's demeanor and race, and concluding for "tactical reasons" that the juror was "perfectly accessible to my opinion, and he has not answered in a way that he could not be fair." The trial court denied the challenge, noting it was not considering the juror's race, and concluding Juror No. 3's responses, "albeit somewhat hesitatingly, indicated that he would do his best to be fair in both the guilt and penalty phases."

Defendant does not meet his burden of demonstrating that his counsel's performance was deficient. Given the defense strategy of showing that defendant and his family distrusted the police due to their experiences growing up in Mississippi during the civil rights movement, it would have been reasonable for defense counsel to conclude that Juror No. 3, who grew up in Alabama, would have been "accessible," as counsel described, and open to hearing defendant's side of the case. "[A] reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*People v. Mickel*, *supra*, 2 Cal.5th at p. 198.)

Further, the record supports the trial court's finding that Juror No. 3 could be impartial. Although the juror expressed concern about his ability to be fair because he had relatives in law enforcement, he repeatedly stated that he would try to be fair and impartial. We credit the trial court's conclusion, based on observing the juror firsthand, that he had the ability to serve on defendant's trial. " ' "In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under

52

such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts." ' " (*People v. Souza* (2012) 54 Cal.4th 90, 123.) Defendant thus cannot show prejudice or that the court erred.

Therefore, defendant's claims fail.

### 3. *Denial of Two* Batson/Wheeler *Motions*

Defendant, an African-American, contends that the trial court erroneously denied two motions challenging the prosecution's peremptory challenges to three African-American prospective jurors. (*Batson v. Kentucky*, *supra*, 476 U.S. 79; *People v. Wheeler*, *supra*, 22 Cal.3d 258.) On the first motion, the court found no prima facie showing of discrimination in the removal of L.T. and S.J. Defendant disputes the finding with respect to S.J. On the second motion, challenging the removal of M.M., defendant contests the court's conclusion that the prosecutor's proffered race-neutral reasons were credible. We find no error.

### a. First Motion

#### i. Background

When the court heard defendant's first motion, 36 randomly selected jurors had been questioned. The court excused seven jurors for hardship or cause, leaving 29 jurors available for peremptory challenge, including three African-Americans, L.T., S.J., and Juror No. 3. The prosecutor exercised nine peremptory challenges; he used his first and sixth challenges on jurors L.T. and S.J., respectively. At one point, the prosecutor accepted the jury as composed with Juror No. 3.

Before voir dire, prospective jurors filled out a 20-page questionnaire on their views and background. Prospective juror S.J. felt "fine" about law enforcement and the judicial system. He responded affirmatively to several

questions about whether he could be a fair and impartial juror regarding race. There was nothing about the charges that would affect his ability to be fair and impartial, he would follow the law as instructed, he would not credit more or less a police officer witness, he could discuss his thinking about the case and listen to other jurors, and he could be fair to both sides because he had an "open mind." S.J. had "no feeling" about the death penalty, circled 6 out of 10 on whether he was in favor of it, and explained that its purpose was "an eye for an eye."

During defense voir dire, when asked if he wanted to sit on this jury, S.J. responded, "I look at it as, if I have to, I have to." When asked again if he were willing to sit on the jury and be fair, S.J. replied, "Yes, if I have to." In response to the prosecutor's question about whether he was a "very quiet man," S.J. said "sometimes." He indicated he was not a "very private man." When the prosecutor pressed him about having no opinion on the death penalty, S.J. explained, "That means that I believe that in some cases a death penalty is justified and in some case I have to look at the case." S.J. affirmed that the death penalty could be used sometimes, stating, "Yeah, I would think I was more neutral. If I have to make a decision, I can make that decision." S.J. indicated he was not "easily fooled."

The trial court found the defense had failed to make a prima facie showing that the prosecutor had exercised peremptory challenges on the basis of race, commenting that S.J.'s "initial remarks [were that jury duty] is like having a root canal. He clearly didn't want to be here. Would be here if forced to stay, but his whole attitude and reluctance, the air about him suggests that a peremptory challenge was appropriate." However, the court appears to have at least partially confused S.J. with another prospective juror, D.B., who made the comment likening jury duty to a root canal. The court also noted that the prosecutor had accepted the panel when it included Juror No. 3.

54

Before the jury was sworn, the prosecutor peremptorily challenged a total of 17 out of 47 jurors available for challenge after for cause and hardship excusals, including challenges to three of four African-American jurors (L.T., S.J., M.M., Juror No. 3). In alternate jury selection, the prosecutor peremptorily challenged three out of 13 jurors, including a challenge to one of two available African-American jurors (challenging juror D.B. and accepting Alternate Juror No. 3).

### ii. Analysis

" 'Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. [Citations.] Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.' [Citation.]

" 'There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.' [Citation.] 'A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] "The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant]." ' " (*People v. Parker* (2017) 2 Cal.5th 1184, 1210-1211.)

"Because the trial predated the United States Supreme Court's decision in *Johnson v. California* (2005) 545 U.S. 162, and exactly what standard the lower court used in finding no prima facie case is unclear, 'we review the record independently to "apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror" on a prohibited discriminatory basis.' " (*People v. Parker, supra,* 2 Cal.5th at pp. 1211-1212.)

"Although we examine the entire record when conducting our review, certain types of evidence are especially relevant. These include whether a party has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged those prospective jurors in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group to which a majority of remaining jurors belong. [Citation.] We may also consider nondiscriminatory reasons for the peremptory strike that 'necessarily dispel any inference of bias,' so long as those reasons are apparent from and clearly established in the record." (*People v. Reed* (2018) 4 Cal.5th 989, 999-1000.)

Defendant asserted in each of his *Wheeler* motions that the prosecutor's lengthier voir dire of African-American jurors, and his effort to establish bias, revealed his race-based jury selection, especially when contrasted with his effort to rehabilitate non-African-American jurors. He asserts the prosecutor's comment that he was "forced to take jurors simply because of their race" reveals his discriminatory intent.

Defendant provides no examples in support of his general claim about the prosecutor's style of voir dire, and the record does not support his claim. The prosecutor's comment that he was forced to accept jurors on the basis of race was

56

in response to an earlier comment by the trial court in which it expressed reluctance to dismiss African-American jurors because of the small number of available African-American jurors, and thus was a comment on the court's approach to jury selection.

The trial court found S.J. did not want to be a juror based on his demeanor, which would have been a permissible basis for excusal. (E.g., *People v. Parker, supra,* 2 Cal.5th at p. 1213.) S.J.'s response to the two questions about whether he was willing to sit on the jury was, "if I have to," which suggests he "didn't want to be here" as the court noted.

However, as defendant observes on appeal, the trial court erroneously attributed to S.J. a comment likening jury service to a root canal. It is unlikely, however, that the trial court completely confused the two jurors given that S.J. was an African-American male and D.B. was a Caucasian female (peremptorily challenged by defendant). As noted above, the trial court had stated its concern about retaining African-American jurors in the pool, which could be seen, for example, in the court's effort to rehabilitate L.T. through its own voir dire of L.T. when she had stated that she would have difficulty with the case. The more likely explanation for the apparent confusion, therefore, is that both jurors appeared reluctant to serve and the trial court correctly surmised S.J. "didn't want to be here" based on his demeanor, but misremembered which juror made the specific comment. Notably, in his follow-up response in the hearing below, defense counsel did not address the court's observation about S.J.'s demeanor, instead acknowledging the low number of African-Americans excluded and a lack of pattern in the prosecutor's peremptory challenges, but reiterating his assertion that the prosecutor had questioned African-American jurors at length to establish bias.

The trial court also noted the prosecutor's acceptance of Juror No. 3 on the panel. (See *People v. Clark* (2011) 52 Cal.4th 856, 906 [while not dispositive,

57

acceptance of a member of the group indicates prosecutor's good faith].)  With respect to both *Wheeler* motions, defendant challenges the significance of this fact because Juror No. 3 had expressed pro-prosecution sentiments as described in section II.C.2, *ante*.  The prosecutor had previously made a for-cause challenge to Juror No. 3, for the reason that the juror had expressed bias in favor of the prosecution, explaining in response to defense objection to the challenge, that he had similarly stipulated to the excusal of other jurors who had expressed pro-prosecution views out of a duty to ensure that defendant had a fair trial, which is supported by the record.  From these circumstances, it is difficult to draw an inference about the prosecutor's acceptance of Juror No. 3 on the panel.  Even if we agreed that the prosecutor accepted Juror No. 3 only because of his pro-prosecution views, that circumstance would simply show that he was exercising his challenges based on which jurors would be most favorable for him and not for racial reasons.

Turning to jury statistics, prior to the court's ruling on defendant's motion, "[w]hile the prosecutor did excuse two out of three [African-Americans], the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible." (*People v. Bell* (2007) 40 Cal.4th 582, 597-598, fn. omitted.)  Neither does the prosecutor's use of two out of nine peremptory challenges against African-American jurors suggest a disproportionate use of peremptory challenges.  (See, e.g., *People v. Sánchez* (2016) 63 Cal.4th 411, 436 [use of two of eight peremptory challenges against Hispanic jurors was insignificant].)  While the percentage of African-American jurors challenged (2 out of 3) was much higher than the percentage of African-American jurors available for challenge (3 out of 29), "because of the small sample size the disparity carries relatively little information." (*People v. Bell, supra,* 40 Cal.4th at pp. 598, fn. 4.)  Before the jury was sworn, the prosecutor had struck three out of

58

four available African-American jurors in the main jury pool and a total of four out of six available jurors with the inclusion of the alternate jury selection. The prosecutor used 3 out of his 17 challenges against African-American jurors in the main jury selection and 4 out of 20 challenges in the entire jury selection. The final jury and the alternate jury each included one African-American juror (Juror No. 3 and Alternate Juror No. 3).

Any inference of bias is " 'necessarily dispel[led]' " because nondiscriminatory reasons for the prosecutor's peremptory strikes of L.T., M.M., and D.B. "are apparent from and clearly established in the record." (*People v. Reed*, *supra*, 4 Cal.5th at p. 1000.) L.T.'s responses both in her written questionnaire and in her voir dire, and as noted by the prosecutor during two earlier for cause challenges of her, revealed significant race-neutral reasons for L.T.'s challenge, namely, that she perceived a conflict between her religious beliefs and the death penalty, and had felt upset about an incident where she was a victim and believed the Riverside Police Department had made an inadequate investigation. L.T. had also expressed deep reluctance to serve on a jury where she would have to view autopsy photos. As discussed in section II.C.3.b, *post,* the record supports the prosecutor's proffered race-neutral reason for peremptorily challenging M.M. As to the prosecutor's challenge to D.B. during alternate jury selection, the trial court denied defendant's third *Wheeler* motion at the first stage, noting that D.B. had served on a hung jury, which defendant has not challenged on appeal. The prosecutor had questioned D.B. about her service on the hung jury. Likewise, the prosecutor's voir dire of S.J. specifically addressed his questionnaire responses and was not desultory. (*People v. Edwards* (2013) 57 Cal.4th 658, 698-699.)

Defendant also asserts that "the prosecutor attempted to exclude the first eight Black jurors to appear in the jury box." Defendant does not identify any

specific jurors.  While a prosecutor's specious for-cause challenge to other jurors of the same race might support an inference of race-based discrimination (*People v. Sánchez, supra,* 63 Cal.4th at p. 437), none appears here.

Defendant also requests that we compare S.J.'s questionnaire responses to those of Juror Nos. 7 and 12, both non-African-American, asserting that all three jurors "were males in their 50s, with service/repair jobs for major companies" and all three circled "6" on the death penalty scale.  "We have often declined to undertake comparative juror analysis at step one of the *Batson/Wheeler* framework.  [Citations.]  Nonetheless, such analysis can be helpful in certain circumstances to assess whether a defendant established a prima facie case of bias."  (*People v. Reed*, *supra*, 4 Cal.5th at p. 1002.)  In his questionnaire, Juror No. 7 was more expressive than S.J. in explaining his opinions.  Neither juror's voir dire comments indicated a reluctance to serve, but neither was asked about it.  It is difficult to form a conclusion without having observed the demeanor of the three jurors.

S.J.'s affirmative response to several questions on the jury questionnaire indicated that he could be fair and impartial, and the trial court, in concluding that S.J. did not want to be a juror, erroneously attributed to him the comments made by another juror likening jury service to a root canal.  However, it is difficult to make a prima facie showing from the statistics of the peremptory challenges and the record reveals race-neutral reasons for the prosecutor's challenges.  Moreover, S.J.'s comment that he would serve as a juror if required is consistent with the trial court's finding that S.J.'s demeanor indicated he did not want to be a juror.  In his response below, defendant did not address the court's comment that S.J. "[w]ould be here if forced to stay, but his whole attitude and reluctance, the air about him" indicated that he did not want to perform jury duty.  Defendant therefore fails to show that "the totality of relevant circumstances gives rise to an inference of

discriminatory purpose" in the prosecutor's challenge of S.J.  (*People v. Parker,*
*supra*, 2 Cal.5th at p. 1213.)

### b.  *Second* Wheeler *Motion*

#### i.  *Background*

Defendant's second *Wheeler* motion concerned the prosecutor's fifteenth
peremptory challenge, to M.M.  M.M. had a master's degree in sociology and had
been working at the Los Angeles County Department of Public Social Services for
eight years as an administrator managing assistance programs and conducting
research in the jobs training program.  M.M. stated he would be capable of voting
for the death penalty after hearing the facts.  He affirmed that he would not hold
the prosecutor to a higher standard than the law required.  M.M. was born in
Africa and had lived in the United States for 21 years, and explained that his
master's thesis was about colonial education, which was, "[t]o put it simply, just a
brainwash to allow the education of Africa."  M.M. was "neutral" on the death
penalty, denied having "sociological problems" with it, concluded it was "just . . .
a form of punishment," and "respect[ed] different views" about it.  M.M. would be
able to vote for the death penalty even after seeing defendant in the courtroom for
several weeks.

In response to the *Wheeler* motion, the prosecutor explained that he
excused M.M. because his dissertation had been about colonization, which M.M.
"found . . . to be a brainwashing to exploit his country, I guess."  The prosecutor
had "grave concerns" about anyone who worked or had training in social services,
citing M.M.'s master's degree in sociology and career at a social services agency.
The prosecutor was familiar with "the social services work mindset" and the
employment services division that employed M.M., and concluded M.M. "would

61

not make a good juror." During his voir dire of M.M., the prosecutor had stated that people with a sociology degree often "want to help others."

The trial court found defense counsel had made a prima facie showing of race-based jury selection but credited the prosecutor's race-neutral reasons for excusing M.M. The court explained that in his experience both as a judge and a former prosecutor, "prosecutors generally will excuse people with social welfare type of backgrounds. And the reason for that—again, this is based on my observations and personal experience—is that they are very much inclined to hold the prosecution to a higher standard than that required by the law. In other words, something more than proof beyond a reasonable doubt." The court also observed that Juror No. 3 was still on the jury.

### ii. Analysis

At the third step of *Batson* analysis, after a prosecutor has posited a race-neutral explanation for a peremptory challenge, "the trial court must decide whether the movant has proven purposeful discrimination. [Citation.] In order to prevail, the movant must show it was ' "more likely than not that the challenge was improperly motivated." ' [Citation.] This portion of the *Batson/Wheeler* inquiry focuses on the subjective genuineness of the reason, not the objective reasonableness. [Citation.] At this third step, the credibility of the explanation becomes pertinent. To assess credibility, the court may consider, ' "among other factors, the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." ' [Citation.] To satisfy herself that an explanation is genuine, the presiding judge must make 'a sincere and reasoned attempt' to evaluate the prosecutor's justification, with consideration of the circumstances of the case known at that time, her knowledge of trial techniques, and her

62

observations of the prosecutor's examination of panelists and exercise of for-cause and peremptory challenges. [Citation.] Justifications that are 'implausible or fantastic . . . may (and probably will) be found to be pretexts for purposeful discrimination.' [Citation.] We recognize that the trial court enjoys a relative advantage vis-à-vis reviewing courts, for it draws on its contemporaneous observations when assessing a prosecutor's credibility." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158-1159.)

Here, the court, relying on its experience as a trial judge and a prosecutor, credited the prosecutor's reason for excusing M.M. because of his background in sociology and career in social services. We conclude that the prosecutor's proffered reason, and the trial court's reliance on its knowledge of jurors and prosecutorial trial strategy, in crediting the reason, to be reasonable. (*People v. Streeter* (2012) 54 Cal.4th 205, 225 [reasonable to believe that a social services caseworker would be more sympathetic to the defense]; *People v. Watson* (2008) 43 Cal.4th 652, 677 [prosecutor's concern about social worker's ability to be objective was reasonable in light of her work at the Los Angeles County Department of Children and Family Services]; *People v. Lewis* (2008) 43 Cal.4th 415, 476 [finding credible prosecutor's asserted reasons for striking a juror who worked as a correctional counselor and had a background in psychology and sociology].) There is substantial evidence in the record to support the prosecutor's stated reason given M.M.'s responses about his background and work and given the prosecutor's familiarity with the agency for which M.M. worked.

Defendant contends that comparative juror analysis shows that the prosecutor's reasons for excusing M.M. were not genuine because he accepted Juror Nos. 2 and 11, who had similar backgrounds but were Caucasian. "[E]vidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is

adequate to permit the urged comparisons." (*People v. Lenix* (2008) 44 Cal.4th 602, 622.) " 'The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor. [Citations.]' [Citation.] 'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.' [Citation.] 'At the same time, "we are mindful that comparative juror analysis on a cold appellate record has inherent limitations." [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved.' " (*People v. Winbush* (2017) 2 Cal.5th 402, 442.)

The prosecutor's proffered reasons for excusing M.M. were M.M.'s thesis about the brainwashing of Africa through colonial education and his master's degree in sociology, as well as his career in social services. Juror No. 2 had a master's degree in entomology, the study of insects, and worked as a research associate in that field. Juror No. 11 had a bachelor's degree in "general education," including psychology courses, and had been working as an elementary school teacher for four years. So, in fact, neither Juror No. 2 nor Juror No. 11 shared much in common with M.M. from a career or educational perspective.

This court has also compared the responses of a challenged juror to other peremptorily challenged jurors of a different race. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 478.) Prior to the peremptory challenge of M.M., the prosecutor similarly inquired of, and peremptorily challenged, L.G., a non-Black juror, who had a bachelor's degree in sociology and career as a school teacher. The

prosecutor asked L.G. if her background in sociology and child development would make it difficult to impose the death penalty. Like M.M., L.G. said she could impose the death penalty, but the prosecutor nonetheless excused her, which suggests the reason for excusing M.M. based on his sociology background was genuine.

Therefore, the record supports the trial court's conclusion that the prosecutor's race-neutral reasons for challenging M.M. were credible.

### 4. Comment on Right to Trial

Defendant contends the prosecutor committed misconduct during voir dire by making comments about a defendant's right to trial.

A prospective juror had explained that she had been a witness to a crime but that the case had never gone to trial because the defendant confessed. The prosecutor responded, "Do you understand, though, that even somebody who did it can ask for a trial?" He stated further, "That it's a constitutional right for everybody, even if they did it, to ask for a trial? Will you not hold it against the defendant?" The court overruled defendant's objection. Counsel renewed the objection the next day, expressing concern "that some of these jurors now think that Mr. Woodruff could have avoided this trial but asked for it." The trial court concluded the comments were not prejudicial but instead "ingrain[ed] in the minds of the jurors that they're to follow the law, to accord him with the presumption of innocence that the law requires . . . ."

" 'In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury.' [Citation.] 'When, as here, the point focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury

65

construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 797.)

Defendant contends the comments implied that the prosecution offered defendant a plea deal that he had rejected and that the jurors would "plausibly conclude that even though the defendant was guilty, he had asked for a trial." The comments were not misconduct. The prosecutor was responding to a juror's statement suggesting that cases do not go to trial if there has been a confession. Because defendant admitted shooting Officer Baker, the prosecutor did not commit misconduct in clearing up the juror's misconception. The main point of his comments was that the jurors could not hold defendant's decision to go to trial against him; in other words, jurors were to presume defendant to be innocent and require that the prosecution prove him guilty beyond a reasonable doubt. "The prosecutor's statements 'were not legally erroneous, and defendant had ample opportunity to correct, clarify, or amplify the prosecutor's remarks through his own voir dire questions and comments.' " (*People v. Thomas, supra,* 53 Cal.4th at p. 797.) And in fact, he did: on further voir dire, defense counsel commented to the jury, "So, all of you believe at this point that Mr. Woodruff is innocent? You all understand that concept? You all understand that Mr. Woodruff doesn't have to—It's the prosecution's obligation to prove that he's not innocent. Do you understand he's innocent up until the point that you actually return a verdict . . . ?" Therefore, defense counsel cleared up any erroneous assumptions by the jury.

"Moreover, as a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors or misconduct 'prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings . . . .' " (*People v. Medina* (1995) 11 Cal.4th 694, 741.)

### D. Guilt Phase Issues

#### 1. *Presence of Officers in the Courtroom*

Defendant contends the trial court erred in refusing his request to limit the number of uniformed officers present in the courtroom, which "created [an] intimidating atmosphere."

Before trial, defendant requested an order "limiting or prohibiting the presence of uniformed peace officers in the trial," expressing concern that the presence of several officers would distract the jury. The court responded, "I certainly understand and understand your concern. I can't say that I am not without the same concern to some extent myself, but here's the problem: I have no right to tell them how to dress when they come in here. This is a public proceeding and they can come in here."

"The right to a public trial is not that of the defendant alone. (Cal. Const., art. I, § 29; *Press-Enterprise Co. v. Superior Court* (1986) 478 U.S. 1, 7.) The public policy in favor of open judicial hearings was emphasized in this court's opinion in *Press-Enterprise Co. v. Superior Court* (1984) 37 Cal.3d 772, 779-780. [Citation.] Only if restriction is necessary to preserve a defendant's right to a fair trial may the court restrict attendance by members of the public. Because a First Amendment right of access to judicial proceedings is also recognized, they may not be closed 'unless specific, on the record findings are made demonstrating that "closure is essential to preserve higher values and is narrowly tailored to serve that interest." ' " (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298-1299.)

In determining whether the presence of uniformed officers denies a defendant's right to a fair trial, a reviewing court must look "at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show

67

actual prejudice, the inquiry is over." (*Holbrook v. Flynn* (1986) 475 U.S. 560, 562, 572; *People v. Stevens* (2009) 47 Cal.4th 625, 638.)

We conclude there was no abuse of discretion. Defendant points to no place in the record that states the number of officers present in the courtroom. At the record correction hearing, when asked about the number of uniformed officers present during the trial, the trial court noted there were never enough uniformed officers present "to give me concern that there would be an intimidation factor" and that if during the trial there had been more than two or three uniformed officers present, the court would have expressed concern. Therefore the concerns expressed by defendant prior to the trial are insufficient to support a claim of error or prejudice.

Defendant also contends that the presence of officers wearing blue wristbands in memory of Jacobs diminished his chance of receiving a fair trial. Defendant bases this assumption on the responses of two officer-witnesses to defense counsel's own questions concerning the wristbands the witnesses were wearing and whether many officers wore the wristbands. Because defendant never objected to the presence of officers wearing wristbands and instead called attention to them, he has forfeited his claim. (*People v. Carrasco, supra,* 59 Cal.4th at p. 965.)

Defendant also asserts an intimidating atmosphere was created when "Officer Baker's brother, a former police officer, had gestured with his fingers like he was pointing a gun at the defendant as the room was emptying for a recess." Blankenship objected to the gesture at trial on the ground that it would intimidate defendant, who was going to testify. The trial court asked the sheriff's department to investigate the incident and stated, "The Court will not tolerate any disruptive or intimidating or other inappropriate conduct by anyone in the audience. And if it

68

occurs and if I see it, you will, at the very least, be removed from the courtroom for the duration of this trial. And, if appropriate, sterner measures will be taken."

Blankenship's objection at the trial was out of concern for defendant's "sense of peace" rather than for its effect on the jury, which was leaving for recess. Thus, the claim is forfeited because defendant did not object on the ground he now urges. It also lacks merit. Following the court's instruction to the sheriff's department to investigate the incident, the issue was not mentioned again. " 'Spectator misconduct is a ground for mistrial if it is "of such a character as to prejudice the defendant or influence the verdict," ' and the trial court has broad discretion in making this determination." (*People v. Carrasco, supra,* 59 Cal.4th at p. 965.) Here there is no evidence that the jury saw or was prejudiced by the gesture, assuming it occurred. We find no error.

### 2. *Photographs of Defendant in Jail Jumpsuit*

Defendant contends the trial court erred in admitting, over defense objection, two photographs showing him in an orange jail jumpsuit on the day of his arrest and that this allowed the jury to speculate that he was dangerous. Carr testified that when defendant crawled out of the house, four or five officers "dived" onto him and an officer put his knee into defendant's back, and she heard defendant cry out in pain. The prosecutor subsequently sought to introduce the photos to show defendant was not injured and explained that defendant had been given the jumpsuit to wear because he had not been wearing any clothes when he was arrested. The trial court examined the photographs and found them to be relevant and not prejudicial.

Later, a prosecution witness was shown a photograph of defendant in an orange jail jumpsuit to identify for the jury what he looked like on the day of his arrest. The witness testified that the police gave defendant the jumpsuit because

69

he had come out of his house naked. Defense counsel renewed his earlier objection, explaining his concern about the prejudicial impact of the sight of defendant in jail clothing even though "it's very clear that they know he's in custody." Defendant wore civilian clothing at the trial. At an earlier hearing concerning how defendant would appear at the crime scene viewing, the court had noted that the jury "knows he's in custody."

The trial court did not abuse its discretion in admitting the photographs because they corroborated the prosecution witnesses' testimony. (*People v. Winbush*, *supra*, 2 Cal.5th at p. 459.) In any event, defendant fails to show prejudice. In *People v. Johnson* (2015) 61 Cal.4th 734, 768, the defendant similarly objected on grounds of irrelevance and prejudice to the admission of a photograph showing him in handcuffs and an orange prison jumpsuit. We concluded, "To the extent the jury could have inferred that defendant had been in custody and was dangerous because of the use of handcuffs, it seems unlikely for the jury not to believe that he was, at some point, in custody and under arrest" while the case was under investigation. (*Ibid.*) Here, although it was undisputed that the jury knew defendant had been in custody, he wore civilian clothing throughout the trial. There was, therefore, no "constant reminder" that defendant was in custody, and "the fundamental presumption of our system of criminal justice that the defendant is innocent until proved guilty beyond a reasonable doubt" was not disturbed. (*People v. Taylor* (1982) 31 Cal.3d 488, 494, citing *Estelle v. Williams* (1976) 425 U.S. 501, 504.)

*3. Testimony Referencing Defendant's Arrest Record*

During cross-examination, prosecution witness Keith Kensinger briefly referenced defendant's "previous arrest record." He said nothing specific about

70

the record.  Defense counsel did not object.  Defendant contends the reference violated his state and federal rights to due process and a fair trial.

"By statute, evidence of prior specific acts of misconduct is ordinarily inadmissible either to prove conduct on a specific occasion or to attack a witness' credibility.  ([Evid. Code], §§ 787, 1101, subd. (a); see § 788 (exception for prior felony convictions).)  More specifically, it has long been held that evidence of an accused's prior arrests is inadmissible."  (*People v. Anderson* (1978) 20 Cal.3d 647, 650.)  A witness's volunteered statement can be the basis for error.  (*People v. Wharton* (1991) 53 Cal.3d 522, 565-566.)

Defendant has forfeited the contention by failing to object.  (Evid. Code, § 353; *People v. Jennings* (1991) 53 Cal.3d 334, 375 ["Because defendant fails to establish that testimony revealing his ex-convict status, and his prior arrest, is so prejudicial that its admission must always result in reversal of the judgment, we hold counsel's failure to object or seek some other form of remedial action waived the issue for appeal."].)

Moreover, the comment was harmless beyond a reasonable doubt even if we assume, without deciding, that it violated defendant's federal constitutional rights.  (*Chapman v. California* (1967) 386 U.S. 18, 24.)  The brief and vague comment told the jury nothing it did not know from other evidence in the case.  The jury was already aware that defendant had an arrest record.  In defendant's interview, the police had questioned him about whether he was currently on any drugs or alcohol, noting his arrest history for drunk driving.  Defendant explained to the officers that he had stopped drinking when he got a DUI in 1994 and had been sober since then.  The jury also knew that defendant had been afraid to go outside when the police arrived because he thought he had an arrest warrant for drunk driving.  No reason exists for the jury to believe the reference to an arrest record referred to more than this.  The comment could not have been prejudicial.

71

### 4. *Testimony of Lead Investigator Opining on Guilt*

Several times, in response to questions by both parties, prosecution witness Martin Silva, the lead investigator in the case, expressed to the jury his opinion that defendant was guilty, as well as his reasons for so concluding. " '[O]pinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) Defendant claims ineffective assistance of counsel, prosecutorial misconduct, and judicial misconduct with respect to the admission of Silva's testimony. We find no error.

Part of the defense strategy was to show that the police failed to make a thorough investigation into the case because they prejudged defendant to have murdered Jacobs. While questioning Silva, defense counsel tried to show that the investigation had been compromised and that Silva was determined to conclude defendant was guilty. At one point, counsel asked, "You believe, with everything that you are, that Mr. Woodruff fired a bullet that didn't ricochet that hit Mr. Jacobs, don't you?" Counsel then elicited the "factual basis for [Silva's] belief." On redirect, the prosecutor reviewed with Silva the evidence that had been developed in the investigation and that led him to conclude "that this defendant is guilty of murder." To the prosecution's question whether, "having investigated six to 700 murders . . . , [Silva had] any doubt that the defendant's guilty," Silva responded he did not. On recross, defense counsel sought to show that Silva was biased.

During a break, the court expressed concern that Silva's opinion and described reasons for concluding defendant was guilty had prejudiced defendant, and discussed the issue with defendant at length before asking if he wished to continue the trial and continue with Blankenship. Defendant said that he did.

Defense counsel explained that given the testimony presented by several prosecution witnesses over the previous 13 days of trial, Silva's testimony would

not have prejudiced defendant and the jury would have surmised that Silva had concluded that defendant was guilty. Thus Blankenship needed to elicit Silva's opinion about the case to expose his bias and show why the investigation had not been thorough. The court concluded that the testimony had prejudiced defendant nonetheless and that the court should have disallowed the questioning on its own motion. Given defendant's decision to continue with the trial, the court instructed the jury with CALJIC No. 2.20 ("Believability of Witness"), and further instructed the jury that "[a]ny witness who has testified in this proceeding and who may have voiced an opinion as to the question of guilt or innocence of the defendant, that testimony is not to be considered by you." When Silva's testimony resumed, the court reinstructed the jury to disregard any opinion of any witness as to guilt and that "only you will ultimately make that determination that is the ultimate question of fact before you, and only you, the members of the jury, will make that determination."

We find no misconduct. In light of the defense strategy of trying to show that the police simply believed defendant guilty and thus failed to investigate the case fully, the prosecution was certainly entitled to show why the police did believe him to be guilty and thus investigated the case as they did.

We also find no judicial error. The court did intervene, foreclosing any further testimony by Silva as to his opinion on guilt, and reinstructing the jury when it appeared the prosecution was revisiting the topic during redirect. Given defense counsel's stated strategy of drawing out Silva's bias, and given defendant's reaffirmation of Blankenship as his choice of counsel, the court was limited in its discretion to prohibit the testimony. "A criminal defendant's constitutional right to confront witnesses is violated when the court prohibits the defendant from conducting otherwise appropriate cross-examination designed to show a prototypical kind of bias on the witness's part, and thereby provide the jury

with facts from which it could appropriately draw inferences regarding the witness's reliability." (*People v. Sánchez, supra,* 63 Cal.4th at p. 450.) Moreover, the court offered defendant a mistrial, but he elected to continue the trial after being sufficiently apprised by the court of its concerns about prejudice. Therefore, the court did not abuse its discretion in acceding to defendant's decision to continue with Blankenship and in mitigating any harm by instructing the jury that it alone was to determine guilt.

The real question is whether, as defendant contends, his attorney was ineffective. To show ineffective assistance, defendant must show that "counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance." (*People v. Alexander, supra,* 49 Cal.4th at p. 888; see *Strickland v. Washington, supra,* 466 U.S. at p. 687.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington, supra,* 466 U.S. at p. 694.) Trying to show that the police believed defendant was guilty and thus did not adequately investigate the case was a reasonable defense strategy. "A reviewing court will not second-guess trial counsel's reasonable tactical decisions." (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

Moreover, we see no prejudice, especially in light of the trial court's admonitions. In *People v. Riggs* (2008) 44 Cal.4th 248, the prosecutor elicited from an investigator (Pina), the opinion that the defendant was guilty. We found no prejudice. The witness's "testimony that he believed defendant was guilty as charged . . . did not present any evidence to the jury that it would not have already inferred from the fact that Pina had investigated the case and that defendant had been charged with the crimes. There was no implication from the questions or answers that Pina's opinions were based upon evidence that had not been

74

presented to the jury. [Citation.] In addition, we see nothing in the record that would lead us to conclude that the jury was likely to disregard the instructions it received concerning its duty to decide the issues of credibility and guilt based upon its own assessment of the evidence, not the opinions of any witness." (*Id.* at p. 300.)

For similar reasons we see no prejudice here. As defense counsel noted, the jury would hardly have been surprised that Silva had concluded that defendant was guilty. Moreover, the jury had heard over two weeks of testimony from prosecution witnesses before Silva testified, and none of his stated reasons for concluding defendant was guilty was based on information that the jury had not heard or would not hear from other prosecution witnesses. Thus, "[t]he jury's exposure to the unsurprising opinions of the investigating officer that he believed the person charged with the crimes had committed them . . . could not have influenced the verdict—especially in light of the overwhelming evidence against defendant." (*People v. Riggs, supra,* 44 Cal.4th at pp. 300-301.)

### 5. Asserted Prosecutorial Misconduct

#### a. Questioning About Defendant's Mother's Convictions Resulting from the Same Incident

Defendant contends the prosecutor engaged in misconduct by asking Parthenia Carr about her convictions for resisting arrest and for disturbing the peace, stemming from the same events, and then further asking, after the court had sustained a defense objection, whether she had gone through a trial regarding the events.

"[E]vidence of a misdemeanor *conviction,* whether documentary or testimonial, is inadmissible hearsay when offered to impeach a witness's credibility." (*People v. Wheeler* (1992) 4 Cal.4th 284, 300.) However, Evidence Code section 352 considerations aside, evidence of misdemeanor misconduct is

admissible to impeach a witness so long as it involves moral turpitude. (*Id.* at pp. 295–297, p. 300, fn. 14.)

The trial court here concluded that the misdemeanor convictions were inadmissible and, further, that they did not involve offenses of moral turpitude. The court noted it had read to the jury the pretrial instruction to disregard any question to which an objection was sustained and to not speculate as to what the answer might have been, and further offered to instruct the jury to disregard the question. Defense counsel wanted to consider, over the weekend, the best approach for the defense, including whether, "now that the door's open," he might want to elicit the fact that Carr had been "punished and she spent almost a year in jail . . . ."

Defendant now contends that a "corrective instruction" would not have cured the harm caused by the question and, further, that even though the court sustained the objection, because the prosecutor nonetheless persisted in the line of questioning by asking Carr if she had gone through a trial regarding the events, the jury would have concluded that she had been convicted of the offenses. Defendant contends two aspects of the error were prejudicial—the improper impeachment of Carr, and the supposed inference that "if the mother was guilty of a crime, so was the son."

We do not find it reasonably probable that a different outcome would have resulted had the prosecution not asked Carr about her convictions. (*People v. Riggs, supra,* 44 Cal.4th at p. 298.) Furthermore, the question did not infect the trial with such unfairness as to deny defendant due process. (*Ibid.*) The trial court had preinstructed the jury to disregard any questions to which the court sustained an objection and not to speculate as to the answer, and reinstructed it to the same effect prior to closing argument. Further, the jury was aware of the facts underlying the convictions—that Carr frequently played the radio loudly, causing

76

Menzies to call the police, and that Carr was resisting the officer's attempt to arrest her for disturbing the peace. Carr's involvement in the events was central to the case. It is unlikely that evidence of Carr's convictions stemming from the same events was significant to the jury or would have caused it to reach a different conclusion as to defendant's guilt. Therefore, there was no prejudicial misconduct.

### b. Asserted Mocking of Defense Counsel

Defendant contends "the prosecutor . . . repeatedly mocked defense counsel in front of the jury," thereby undermining counsel's credibility and that defense counsel was ineffective where he failed to object. We find no merit to defendant's contentions.

Defendant claims there were five instances of prosecutorial misconduct. We consider them in order. "With regard to some of the points raised in this section, defendant registered no objection to the purported acts of misconduct, and there is no reason to believe that any harm could not have been cured. Those points must therefore be rejected on procedural grounds." (*People v. Osband* (1996) 13 Cal.4th 622, 693.) Moreover, we see no prejudice or general misconduct even if defendant had objected.

Defendant first claims the "prosecutor mocked defense counsel's haircut with a gratuitous, sarcastic and irrelevant comment in jury selection, 'Maybe I can get a ponytail by the end of this trial.' "[9] The prosecutor had asked a prospective juror, "Not to point you out from anybody in the courtroom, but would anybody's haircut influence you in any way?" The juror answered "No," to which the prosecutor responded, "Maybe I can get a ponytail by the end of this trial." The

---

[9] While this incident took place during jury selection, we discuss it in this section for efficiency.

court sustained defense counsel's objection. The record does not state whether Blankenship had a ponytail, but the parties assume the comment was about him.

" 'Personal attacks on opposing counsel are improper and irrelevant to the issues.' " (*People v. Lopez* (2013) 56 Cal.4th 1028, 1072; see *People v. Reyes* (1974) 12 Cal.3d 486, 506 ["name calling of opposing counsel should be avoided"].) Assuming the comment was referring to Blankenship's hairstyle, we find it was harmless. The comment was "fleeting and rather obscure. Even if [it] constituted misconduct, [it did] not constitute the type of deceptive and reprehensible methods that require reversal." (*People v. Lopez, supra,* 56 Cal.4th at p. 1073.) Counsel immediately objected and the court sustained the objection. (*People v. Hill* (1998) 17 Cal.4th 800.) Moreover, misconduct occurring during voir dire is unlikely to unduly influence a jury's verdict. (*People v. Thomas, supra,* 53 Cal.4th at p. 797.)

Defendant next contends the prosecutor engaged in misconduct by commenting in front of the jury that he "would ask for sanctions" regarding defense counsel's cross-examination of a police detective. The comment came after a series of questions in which defense counsel sought to establish that the police did not adequately investigate possible bullet entries in a tree and in the ground and similarly did not do sufficient work to search for a bullet found more than a year later lodged in the side of the house. The court sustained several prosecution objections to the questioning before the prosecutor eventually made the comment about sanctions. The court responded, "All right. You'll not do that in front of the jury. And you'll move on to a new area. I think you've established your point."

During a recess, the court told the prosecutor not to ask for sanctions in front of the jury, stating "You're reacting to him, and you're letting it show." The court then addressed defense counsel, "I can see what you're doing. You

78

obviously have a lot of ability. You're an extremely intelligent gentleman. But I'm gonna start cracking down on the editorializing before you ask your questions." Counsel complained of misconduct by the prosecutor in asking for sanctions before the jury.

There is no reason to believe the prosecutor's comment would have had any significance to the jury in its deliberation of the charges. In response to the comment, the court directed the prosecutor not to "do that" in front of the jury and similarly reprimanded defense counsel to move to another topic in the questioning, noting, "You've established your point." If anything, the prosecutor's comment might have reflected poorly on him because, as the court noted during the break, "you're reacting to him, and you're letting it show."

Next, defendant claims that the prosecutor's comment, while he was searching for an exhibit in the jury's presence, "I'm sure I'll never see it again," was an "accusation that defense counsel was hiding or misplacing evidence." Defendant reaches this conclusion by referring to an earlier comment by the prosecutor, out of the jury's presence, that defense counsel had removed exhibits from the court. " 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 771-772.) We see no reasonable likelihood the jurors would have believed this innocuous comment referred to defense counsel, given that they had not heard the earlier comment. By itself, the comment did not suggest that defense counsel had taken the exhibits.

Defendant's remaining contentions concern the prosecutor's closing argument. First, he complains of the prosecutor's comment that "[t]he defendant has cloaked himself in infirmities of people that are legitimate infirmities. . . . Mental retardation? How shameful. . . . How shameful to pretend to be a member

79

of their population to avoid responsibility. . . . And to cloak this trial in the civil rights movement in Mississippi is despicable." Finally, in rebuttal to defense counsel's repeated assertion that the prosecution was "dialing into emotions,"[10] the prosecutor stated, "And shame on them for making any comment about police officers who cried or were tearful about a fallen friend. Despicable. Turned on emotions? Dialed up emotions? How insulting."

Defendant contends the prosecutor's comments were "disparaging" to defense counsel, which in turn would have resulted in the jury's "moral indignation" directed at defendant. On the contrary, the prosecutor's comments were not a personal attack on defense counsel, but a critical response to his arguments, and thus a "fair rebuttal" to the defense theory that the case was about race and mental disability and that the officers were feigning tears. (*People v. Dykes, supra,* 46 Cal.4th at p. 771.) "The prosecutor's remarks . . . attacked the defense theory, not defense counsel's integrity, and did not constitute denigration of counsel." (*People v. Redd* (2010) 48 Cal.4th 691, 749.)

Moreover, "the rebuttal argument was a response to defense counsel's inflammatory attack upon the prosecution. It is probable that the jurors viewed the argument as mere polemic retaliation intended to rehabilitate the integrity of the maligned law enforcement agencies and gave it little or no consideration. Finally, and perhaps most importantly, the judge instructed the jurors that they had to decide the case based on the evidence received in court and that they could not

---

**10** The defense argued, "Did you notice how on one hand the officers would sob and weep and cry about Officer Jacobs? Officer Baker almost like a faucet turned on. And then I did this on purpose. And then I remember I dialed into those emotions like Mr. Soccio would, then I waited about a minute or two, then I'd talk about whether or not they wanted to kill Mr. Woodruff. And then Mr. Baker went from being visibly upset about Mr. Jacobs, then looked at Mr. Woodruff, saying he intended to kill him. . . . It's all fake. It's all made up."

consider statements of counsel as evidence." (*People v. Perry* (1972) 7 Cal.3d 756, 790-791.)

### c. Asserted "Golden Rule" Comments

Defendant contends the prosecutor committed misconduct in making several statements during closing argument which purportedly "urged jurors to place themselves in the shoes of the victims, prosecution witnesses, the defendant's neighbors and even defense expert witnesses' patients." There was no misconduct.

"As a general rule, a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406.)

Defendant challenges the following comments: (1) The prosecutor stated, " 'Menacing Ben Baker.' I loved that term when the defense used it. If you were gonna be cited for some misdemeanor mild conduct, wouldn't you want to be treated like he treated Parthenia Carr?" (The prosecutor was responding to the defense argument that Baker was "menacing."); (2) The prosecutor stated, "How would you like them as your neighbors, the Woodruff/Carr clan? Each of them in trouble with the law. Every day near your bedroom a radio blasts for hours, and it's gone on for years, and you had the gall to call the police three times? Shame on you for wanting peace and quiet in your own home. . . . Your neighbors, the Woodruff/Carrs, urinate on trees outside. And you'd like them as a neighbor, to have them play the radio? How comforting." (This was a response to the defense argument that "the world would be a better place" if more people were like Parthenia Carr.); (3) The prosecutor argued, "[W]ouldn't you want to sell your house, too, if you lived there? Would you want somebody out on this stoop listening to Oldies three and four hours a day and drinking beer? No. Would you

be accused and faulted for calling the police? Yes, if you were a witness in this trial." The prosecutor further argued, "Would you want to stay up there with [Carr] and a police officer? Who would feel safe? The door had already been pulled away from her. She was already yelled at. Would you stay? Not if you had any sense." (The prosecutor was responding to the defense argument that Menzies was "relentless in making sure that the radio stopped," and that she had run away from Baker and Carr.); (4) The prosecutor stated, "Can you imagine a more deadly place to be trapped with an angry parolee than on a three-foot by six-foot landing, suspended, what, fifteen feet above the ground? Where do you go? Screen door is behind you. The mother is to one side. If you're pushed, hit, you're tall—shorter would have been better up there. Railing at least could have been a little bit safe." (This was a response to defense counsel's observation that Claude Carr was 4 feet, 11 inches tall to suggest he did not pose a threat.); (5) The prosecutor stated, "He may have been about as far as I am from you when he shot and killed Doug Jacobs. Is that very far to take a gun and point it at you and shoot?" (The prosecutor was responding to defendant's statement that he did not aim at Jacobs.)

Defendant also challenges the following comments: (1) Regarding the defense experts, the prosecutor argued, "Let's talk about the doctors for a minute. You met Einstein the other day. If you had a brain problem or suspected problem, would you want him to be the one to interpret your scan? If you had a child who was sick, would you want Dr. Wu to be the one to take the picture and talk about what it meant? . . . . Would you want Dr. Booraem to be your psychologist?"; (2) In discussing the jury instruction on justifiable homicide, the prosecutor stated, "I can say anything I want, that I was in fear for my life so I had to kill you. . . . Well, number one, it assumes I killed you. Now, he's told you he didn't, so he shouldn't be entitled to that instruction based on his version. He says he

didn't do it. You know he did. So what are you going to do, play defense lawyer and say, Well, let's try to apply this."

In none of these comments did the prosecutor "invite the jury to view the case through the victim's eyes." (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1406.) Rather, the prosecutor responded to defense arguments, including the defense's sympathetic portrayal of defense witnesses and unfavorable characterizations of prosecution witnesses. "We see nothing wrong with this approach, which was a reasoned rebuttal to defense counsel's argument, not an appeal to the jurors' sympathy for the victims." (*Ibid.*)

### 6. Asserted Judicial Misconduct

Defendant contends that the trial court engaged in a pattern of misconduct that discredited the defense and demonstrated "that the trial judge allied himself with the prosecution." We disagree. As in *People v. Snow* (2003) 30 Cal.4th 43, 78, where a similar claim was made, we conclude that although the trial judge showed impatience with both the prosecution and the defense at times, and a few of the court's comments to defense counsel were more pointed, the comments did not rise to the level of "an unconstitutional display of judicial bias," but instead amounted to correct rulings occasionally accompanied by impatience at defense counsel's argumentative examination of witnesses and improper remarks.

"Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court 'commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution' [citation]. Nevertheless, '[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying

83

behavior.' [Citation.] Indeed, '[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [defendant] a fair, as opposed to a perfect, trial.' " (*People v. Snow*, *supra*, 30 Cal.4th at p. 78.)

To support his claim, defendant cites 12 instances of purported misconduct, which he does not discuss individually, instead arguing that they cumulatively demonstrated "the trial judge's message to the jury . . . that defense counsel's questions and objections were without merit, and by extension, his entire case was without merit." Defendant objected only to the first instance of alleged misconduct. In his briefing, he tries to avoid appellate forfeiture of claims stemming from the remaining instances by arguing that "defense counsel's attempts to object that the trial judge's sarcastic comments were 'prejudicial to . . . Mr. Woodruff' fell on deaf ears."

"Ordinarily, the lack of an objection at trial forfeits the claim on appeal. [Citation.] However, a failure to object to judicial misconduct does not preclude appellate review when an objection could not have cured the prejudice or would have been futile. (*People v. Sturm* (2006) 37 Cal.4th 1218, [1237.]) In *Sturm,* we ruled the defendant had not forfeited his claim of judicial misconduct, despite his lack of objections, because the hostility between the trial court and defense counsel was evident. (*Ibid.*) Moreover, *Sturm* involved numerous, extensive disparaging remarks." (*People v. Houston* (2012) 54 Cal.4th 1186, 1220.)

We disagree that defendant's lone objection to the purported misconduct "fell on deaf ears" and warranted the conclusion that future objections would have been futile. During testimony, defense counsel had made a series of objections on several grounds. The court stated: "Are you gonna run through the whole Evidence Code?" Counsel responded, "Might as well." To which the court

replied, "Well, I haven't heard a legitimate one yet, so overruled." Defense counsel later commented at length about his concern that the court's comment "feels like it's outside the scope of maintaining respect for me as an advocate on behalf of Mr. Woodruff." The court responded, "Let me say this: I certainly did not intend to be demeaning of you. And if my tone of voice suggests otherwise, I apologize for that. It's certainly not my intent. But when a lawyer makes an objection that's overruled and then runs through half a dozen or so other reasons for it, I think I was perfectly justified in making the comment I did."

We see nothing in the court's comments indicating that the court was antagonistic towards the defense or that future objections would have been futile. The court was merely rebuking defense counsel for articulating a series of objections rather than identifying the appropriate basis for his objection. Moreover, defense counsel invited the court's further response by his comment, "Might as well."

Defendant alternatively argues that that any failure to object was "yet another example of the ineffective assistance defense counsel provided to Mr. Woodruff." We have reviewed the remaining portions of the record he cites as showing misconduct and find defendant's claims of judicial misconduct and bias to be without merit. The court's comments were certainly not " 'so prejudicial that [they] denied [defendant] a fair, as opposed to a perfect, trial.' " (*People v. Snow*, *supra*, 30 Cal.4th at p. 78.)

Two of the alleged instances of judicial misconduct occurred outside the presence of the jury and thus could not have prejudiced defendant. In any event, there was no misconduct. First, defendant identifies a heated exchange between the court and defense counsel on December 12 outside the presence of the jury, which defendant claims demonstrated "the judge's antagonism toward and contempt for defense counsel." Counsel had complained at length to the court,

85

stating, "I think if you scrutinize what you were doing, with respect to your objections and also your effort to intervene in my advocacy and the facial characteristics that you exhibit, I think that's not fair to me as counsel, and it's not fair to Mr. Woodruff, and it's interfering with his right to a fair trial. . . . I have made a list of all the different things that are beginning to trouble me regarding the constant, constant little asides and commentary. And, for the record, I disagree with it. And I was not badgering the witness, and I don't like being dressed down in front of the jury. I consider it to be inappropriate, and I consider it to be prejudicial to . . . Mr. Woodruff."

The court responded, "I don't like misbehavior, and I told you at the start of this trial, I told you I wouldn't hesitate to dress you down or embarrass you in front of the jury. [¶] . . . [¶] Be as zealous and vigorous and as aggressive as you want, but do it professionally. [¶] . . . [¶] It's my obligation to control what's going on in this courtroom. If I think you're being unprofessional or acting inappropriately, I'll call you on it."

The court's comments were an accurate explanation of its duty "to control the conduct of the trial" and of its discretion to " 'rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.' " (*People v. Snow*, *supra*, 30 Cal.4th at p. 78.) Such instances of friction as the one described above "are virtually inevitable in a long trial." (*Id.* at pp. 78-79.) Moreover, in reviewing the record, contrary to defense counsel's assertion, we do not see partiality on the part of the court towards the prosecution. For instance, the court similarly rebuked the prosecutor in the presence of the jury when he asked for

sanctions against defense counsel, stating, "All right. You'll not do that in front of the jury."**11**

The other alleged instance of bias occurring outside the presence of the jury is also without merit. Defense counsel wanted to recall the defense experts Wu and Booraem, who had testified regarding defendant's mental status. The court stated that if counsel did that, then "we can bring [prosecution expert] Waxman back and we could be doing this until next year." Defendant asserts that the court's use of the word "we" indicates "the judge, a former deputy district attorney, still viewed trials from the perspective of the prosecution team." We understand the judge's use of the word "we" to be speaking in general terms about the trial.

Regarding the purported instances of misconduct occurring in the presence of the jury, defendant refers to several other comments by the trial court without explaining how they were misconduct. During the cross-examination of Officer Donald Goodner, who testified that he found defendant's daughter in the house following the shooting, defense counsel asked Goodner in succession four similar questions about whether he knew where the other SWAT team members might have been in relation to the crime scene prior to his arrival, even though Goodner had in response to each question indicated that he did not know. Defense counsel's last question, "They could have been anywhere, right?" prompted the court's response, "Obviously they were somewhere." Defendant does not explain how this comment "expressed sarcasm and scorn to defense counsel." Instead, the

**11**    In other instances outside the presence of the jury, the court similarly chastised both counsel, stating, "I told both of you before, I will not tolerate talking to each other. You talk to me. When one of you is talking, I will listen and the other one keeps quiet. I will give you the floor to say whatever you want." And, "Both of you, editorial comments have no effect on me, other than to annoy me. And to the extent either or both of you are trying to yank the chain of the other one, knock it off. Because the only one who is getting annoyed is me."

court "showed considerable restraint given that defense counsel repeatedly asked the same question after the witness said he did not know . . . ." (*People v. Maciel* (2013) 57 Cal.4th 482, 537.)

Other instances of claimed misconduct described by defendant are similarly without merit.

During the prosecutor's direct examination of Officer Ron Sanfilippo, following a sustained defense objection and motion to strike, defense counsel asked the court to "explain to the jury that they're not supposed to listen to that last answer," to which the court responded, "I'll tell you what, I'll do the explaining and you won't. . . . The last half of the answer referring to the jammed chamber is ordered stricken. The jury is ordered to disregard it."

Near the end of lengthy cross-examination of prosecution expert witness Richard Takenaga, the court intercepted defense counsel's repeated questions to Takenaga on the same line of inquiry with the comment, "Come on. If you're going to continue along with this, I'm going to cut you off right now. Let's move on to something probative."

During the prosecution's cross-examination of defense expert Dr. Joseph Wu, the prosecution objected to Wu's nonresponsive answer following similar nonresponsive answers. In response to defense counsel's objection to the court's telling Wu to respond to the question asked, defense counsel objected that Wu had answered the question. The court responded, "And you're testifying. Unless you want to raise your right hand and take the oath, don't do it again."

In response to defense counsel's instruction to a prosecution witness not to "editorialize," the court interjected, "The only editorializing I have heard is in your statement. You will conduct yourself professionally. Zealousness is fine. Sarcasm and editorializing is not appropriate." Defendant points out another instance where the court instructed the witness not to respond to an argumentative

question posed by defense counsel, stating, "[Defense counsel] wants to argue with you."**12**

Without addressing the comments individually, defendant simply asserts that the comments demonstrate "sarcasm and scorn to defense counsel" that cumulatively was prejudicial. We disagree. The comments were an exercise of the court's discretion to rebuke Blankenship, " 'sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.' " (*People v. Snow*, *supra*, 30 Cal.4th at p. 78.) The isolated comments in a lengthy trial in which the court exhibited some impatience with counsel's argumentative comments and questions do not demonstrate misconduct or bias, much less misconduct that was "so prejudicial that it deprived defendant of ' "a fair, as opposed to a perfect, trial." ' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112.)

*7. Asserted Misrepresentation of Facts by Defense Counsel*

Defendant contends that Blankenship was ineffective because he made several "false or misleading statements, which diminished the defense's credibility with the trial court and jury." We disagree.

As noted previously, a claim of ineffective assistance requires a showing of deficient performance and a reasonable probability that the outcome would have differed absent the deficient performance. (*People v. Alexander, supra,* 49 Cal.4th at p. 888.) Here, the inquiry fails at the outset because the seven instances identified by defendant do not show that Blankenship made "false or misleading statements."

---

**12** Defendant lists three more examples from the cross-examination of prosecution rebuttal expert Dr. Craig Rath, which reflect similar responses by the court to argumentative questions posed by defense counsel. We need not address each individually because like the above example, they do not support defendant's claim of judicial bias.

Defendant first contends that Blankenship misrepresented that he had only received discovery from the prosecution for the first time in March 2002, even though the trial record shows that he had received discovery six months before. In support of this contention, defendant relies on Blankenship's statement, "I received discovery for the first time last week and got a phone call today saying there's additional discovery." Defendant takes Blankenship's comments out of context. A fuller reading of the discussion between the court and parties makes clear that Blankenship was stating that discovery was incomplete and that the prosecution was still sending him discovery. Moreover, this exchange was outside the presence of the jury. Defendant's next claim, concerning a misunderstanding about whether the prosecutor would be presenting a witness at trial, also took place outside the presence of the jury and we need not discuss it.

Defendant next contends that Blankenship attempted to mislead Baker during his cross-examination by reading him a portion of his interview out of context. During the cross-examination, Baker accused Blankenship of lying to him about what Baker had said in the interview. Having reviewed the transcript of the interview, we find Blankenship's understanding to be a reasonable interpretation of Baker's comments as to the timing of the events that day. Baker's comments were less than clear, in part because his description of what had happened that day changed over time.

Next, defendant contends that Blankenship "misrepresented Baker's testimony" when he stated in his question to Baker that Baker was not sure where the gunshots had come from. This was a misrepresentation, defendant claims, because Baker had reported on various occasions that he had looked down the stairway to where he heard the shot. However, in earlier cross-examination, Baker had twice stated that he had "looked to see where the shot had come from."

90

Likely Blankenship was referring to this testimony, and no "false or misleading statement" is apparent.

Defendant further faults Blankenship for asking Sanfilippo whether "stinger balls" could cause harm to a four year old. Defendant seems to be suggesting that Blankenship attempted to mislead the jury because the police had removed the child from the home before they deployed the stinger balls. We see no misrepresentation in the question. Baker had previously testified that when he first arrived on the scene he had interacted with two small children on the front porch. Blankenship's question seems to encompass the possibility that one or both of the children might still have been on the property when the police cleared it with the stinger balls.

Next, based on Takenaga's testimony that he photo-documented the extraction of the bullet from the wall adjacent to Carr's staircase, Blankenship asked whether he had turned over those photographs to the defense. In claiming this question amounted to a misrepresentation, defendant relies on the prosecutor's comment at a sidebar that the "implication from Mr. Blankenship in asking his question is that somehow there's surreptitious withholding of Polaroids." We conclude there was no "false or misleading statement." Blankenship explained at the sidebar, "It is the truth. He did not provide photographs of the extraction. He provided photos of the wall. He just shows a wall. Mr. Soccio's and my interpretation of that testimony is the essence of our dispute with respect to this case. It hits—it has every single element of the difference of how we look at this case."

Finally, defendant similarly relies on another comment by the prosecutor at sidebar that Blankenship's questions to Wu about whether he had turned over all records to the prosecution was "creating a false impression to the jury." However, as the parties resolved in the sidebar, Wu had some records that he had turned over

91

to neither party. Blankenship questioned Wu about the records to counter the prosecutor's implication that the defense had withheld records in discovery. Therefore, defendant's claim that his counsel made misleading statements is without merit.

### E. Sufficiency of the Evidence of the Lying-in-wait Special Circumstance

Defendant challenges the sufficiency of the evidence to support the lying-in-wait special circumstance finding.

"To determine whether the evidence supports a special circumstance finding, we must review ' "the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find" ' the special circumstance allegation true ' "beyond a reasonable doubt." ' " (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.)

The capital murder in this case occurred in 2001, after the Legislature amended section 190.2, subdivision (a)(15) to make the special circumstance applicable when a defendant commits the murder "by means of lying in wait." "Like the former version, the amended lying-in-wait special circumstance requires ' " 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an unsuspecting victim from a position of advantage. . . .' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 629.)

Defendant does not challenge the evidence of intent to kill or claim that there was no substantial period of watching and waiting, but he contends that the evidence does not show he committed the murder with a concealment of purpose and that the shooting was not a surprise attack on an unsuspecting victim.

92

On the contrary, the evidence indicates concealment of purpose. When defendant heard Jacobs say that he would not wait for a sergeant to arrive, defendant retrieved his gun from his bedroom, loaded it, and placed it on the television by the front door. He remained inside listening to the activity upstairs. Defendant eventually exited the house and crossed the porch with his gun. When defendant looked across the street and saw his neighbor Mark Delgado watching him, defendant moved the gun behind his back. Defendant also told the police that the officers upstairs could not see the gun and that he was standing on the porch "peek[ing]" from behind the wall watching and listening for two to three minutes. His "true intent and purpose were concealed by his actions." (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 407.)

Defendant's conduct also satisfied the element of surprise attack. Defendant fired on the officers from a position of tactical advantage and without warning. The officers, who were occupied with arresting defendant's mother and his brother, could not have known that defendant had armed himself and was considering shooting at them. Defendant later confirmed that Jacobs had not seen him when he fired at him. Delgado also observed that defendant was acting "sneaky" and did not hesitate prior to shooting. Thus defendant foreclosed any opportunity for the officers to observe him, firing at them while they were "entirely unsuspecting." (*People v. Livingston* (2012) 53 Cal.4th 1145, 1173 ["Defendant also attacked from a position of advantage—shooting suddenly with a semiautomatic firearm on victims trapped in a small room reading a newspaper or conversing."].)

Defendant contends there was no concealment of his location because he had warned the officers from that location to leave his mother alone. However, "[t]he element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that

he be literally concealed from view before he attacks the victim." ' " (*People v. Sims* (1993) 5 Cal.4th 405, 432-433.)

Defendant also contends his attack on the officers was not a surprise since Baker had called for assistance because he "suspected the defendant represented a threat . . . ." However, Baker, who was making a routine arrest for disturbing the peace, could not, from defendant's warning to leave Carr alone, reasonably "have anticipated defendant's deadly intentions." (*People v. Moon* (2005) 37 Cal.4th 1, 22.)

Thus, the evidence supports the lying-in-wait special circumstance.

### F. Intellectual Disability Phase Issues

#### 1. *Procedure Followed in* Atkins *Hearing*

After the guilty verdict, the court held a hearing to determine whether defendant was intellectually disabled in response to the then-recent decision in *Atkins v. Virginia* (2002) 536 U.S. 304 (*Atkins*). At the close of the hearing, the jury found defendant not intellectually disabled. The Legislature had not yet enacted section 1376, which created procedures courts are to follow when determining a defendant's intellectual disability in a capital case. Defendant contends that we should reverse the jury's intellectual disability finding because the hearing he received denied him his constitutional rights to due process and equal protection of the law. He contends the procedure deprived the jury of guidance on how to evaluate whether defendant had an intellectual disability and also that the trial court erred in denying his motion for a pretrial jury determination of intellectual disability. He further contends the court erroneously admitted at the guilt phase prejudicial statements he made to the prosecution's intellectual disability expert. We find no error.

94

*a. Factual Background*

Before trial, the court and the parties discussed at what stage of the trial the court should hold the intellectual disability hearing required by *Atkins* and whether defendant had a right to a jury determination. The court proposed three phases, a guilt phase followed by an intellectual disability hearing, concluding with the penalty phase. Defendant sought a pretrial determination of intellectual disability, stating it would be "fine" and "appropriate" for the court to determine the issue because it concerned scientific evidence and would avoid prejudicing, as well as death-qualifying, the jury in advance of the determination. The court and the prosecution stated a willingness to have a pretrial bench determination if defendant waived any right to a jury. However, defense counsel also hesitated to give up the right to a jury because of "the benefit of having the . . . death-qualified jury hear elaborately about Mr. Woodruff's mental condition and trouble."

Defendant ultimately filed a motion for a pretrial jury determination of whether defendant was intellectually disabled. The court denied the motion, deciding that the jury would determine the intellectual disability question following the guilt phase. The court encouraged defendant to file a petition for writ of mandate on the issue so that a higher court could provide guidance. The court asked the parties to review its proposed instructions concerning intellectual disability, keeping in mind the teachings of *Atkins* and noting that defendant bore the burden of proof by a preponderance of the evidence. Defense counsel agreed with the instructions.

Following testimony at the intellectual disability hearing, the court instructed the jury that it had to unanimously determine whether defendant had shown by a preponderance of the evidence that he was "significantly subaverage in general intellectual functioning" and "significantly limited in adaptive functioning in at least two of the following skill areas:" communication, self-care,

95

home living, social and/or interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The jury also had to find that the disability manifested before age 18. The court also read standard jury instructions on expert and lay opinion testimony and on preponderance of the evidence, and instructed the jury it could consider the evidence presented in the guilt phase in reaching its decision. Following argument by both parties, the jury returned a finding of no intellectual disability.

### b. Analysis

Holding that the Eighth Amendment forbids the execution of an intellectually disabled defendant, *Atkins* defined intellectual disability as " 'characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' " (*Atkins, supra,* 536 U.S. at p. 308, fn. 3; see *id.* at p. 321.) *Atkins* left to the states " 'the task of developing appropriate ways' " to ensure that intellectually disabled defendants are not sentenced to death. (*Id.* at p. 317.)

Section 1376, enacted in response to *Atkins* (*In re Hawthorne* (2005) 35 Cal.4th 40, 44), defined intellectual disability as "the condition of significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years of age." (§ 1376, subd. (a).) CALCRIM No. 775 issued in response to section 1376 lists the adaptive behavior areas and instructs the factfinder that it must find deficits in two or more areas. Once a defendant submits an expert declaration on intellectual disability, the court orders a hearing to determine the issue. (§ 1376, subd. (b)(1).) "At the request of

96

the defendant, the court shall conduct the hearing without a jury prior to the commencement of the trial.  The defendant's request for a court hearing prior to trial shall constitute a waiver of a jury hearing on the issue of intellectual disability." (§ 1376, subd. (b)(1).)  The procedure for determining intellectual disability is the same whether by a pretrial court hearing or a jury trial following the guilt phase:  Each side presents evidence and has the option to present rebuttal evidence, and each side makes a closing argument.  (§ 1376, subd. (b)(2) & (3).) "A statement made by the defendant during an examination ordered by the court shall not be admissible in the trial on the defendant's guilt." (*Id*., subd. (b)(2).)

Here, the jury trial devised by the trial court was essentially identical to the procedures stated in section 1376.  The trial court's instructed definition of intellectual disability was as provided in section 1376 and in *Atkins*.  The skill areas identified by the court, obtained from *Atkins, supra,* 536 U.S. at page 308, footnote 3, are identical to those listed in the later CALCRIM No. 775.  The hearing followed the guilty verdict, as provided in section 1376.  (§ 1376, subd. (b)(1).)  Both sides presented evidence and gave closing arguments.  (§ 1376, subd. (b)(2) & (3).)  The court instructed the jury that the defense bore the burden of proof by a preponderance of the evidence, as later provided by the statute. (§ 1376, subd. (b)(3).)  The jury returned a unanimous verdict.  Defendant's claim that the "makeshift format gave the jury untrammeled discretion" lacks merit, given that the hearing in fact comported with the key elements of section 1376. Additionally, "[t]he decision in *Atkins* did not require that defendant's trial be conducted in any particular fashion.  The decision in *Atkins* simply held that defendant could not be executed" if he is intellectually disabled.  (*People v. Jackson* (2009) 45 Cal.4th 662, 680.)

Defendant also asserts that section 1376 "would have [granted him] the authority" to choose the pretrial jury determination that the court denied.  This is

97

not true.  Section 1376 only provides for a determination by the jury following the guilt phase or a determination by the trial court preceding the guilt phase.  (§ 1376, subd. (b)(1).)  The court proposed both options and ultimately adopted the first.  Defendant considered both options, noting the benefits of each, but ultimately rejected both options by filing a motion for a pretrial jury determination.  He thus rejected the options he would have had under section 1376.  Moreover, putting section 1376 aside, there is "no constitutional mandate" that a jury determine whether a capital defendant is intellectually disabled.  (*In re Hawthorne, supra,* 35 Cal.4th at p. 50; see *Schriro v. Smith* (2005) 546 U.S. 6, 7-8 [reversing Ninth Circuit's order for jury trial determination of whether defendant was intellectually disabled].)  The United States high court left " 'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction' " on the execution of intellectually disabled defendants.  (*Atkins, supra,* 536 U.S. at p. 317.)

Defendant's due process and equal protection claims are thus without merit.  When we devised the procedure for adjudicating postconviction *Atkins* claims, we explained that taking an approach similar to section 1376 would "maintain consistency with our own legislation and the judicial frameworks adopted in other jurisdictions and . . . avoid due process and equal protection implications."  (*In re Hawthorne, supra,* 35 Cal.4th at p. 47.)

Defendant contends that if section 1376 had been in force, "the jury would have had guidance about how to evaluate the importance of the full-scale IQ scores."  However, the court's instructions provided as much guidance as section 1376 or CALCRIM No. 775.  Section 1376 "makes no reference to one or another clinical test of intelligence, any more than it refers to a particular score as the cutoff point for mental retardation."  (*People v. Superior Court (Vidal)* (2007) 40 Cal.4th 999, 1012.)

Finally, defendant contends that his statements to the prosecution expert would have been inadmissible at the guilt phase under section 1376, pointing specifically to Rath's testimony that defendant said he did not try hard on the earlier IQ test but would do his best the second time because he did not want the label "retarded" and thought his attorney's strategy was a "stupid idea." Rath's testimony was in response to Booraem's testimony that defendant had "put forth his best effort" on the WAIS-III and "was pleased" where he performed well. As part of the defense strategy to negate the mental state for the charges, Booraem had testified in the guilt phase that defendant was intellectually disabled. The prosecution thus was permitted to rebut Booraem's testimony on intellectual disability through its own expert. (*People v. Townsel* (2016) 63 Cal.4th 25, 46, fn. 3; *People v. Stoll* (1989) 49 Cal.3d 1136, 1159 ["The prosecution also may call, in rebuttal, another expert of comparable background to challenge defense expert methods."].) Moreover, defense counsel did not object to the testimony and in fact asked the trial court to consider merging the guilt and intellectual disability phases of the trial, noting "there's advantages to [defendant] having the retardation woven into the trial as far as other issues involving the requirements that [the prosecutor] needs to prove." Therefore, defendant is precluded from now objecting to Rath's rebuttal testimony.

In sum, the court provided defendant a hearing that comported with the requirements of section 1376 and *Atkins, supra,* 536 U.S. 304.

### 2. *The Prosecutor's Comments About Intellectual Disability*

During closing argument, the prosecutor stated, "If a person doesn't look retarded or act retarded, it's because they're not retarded. It doesn't take any professional to let you know that." Defendant contends this was misconduct because it was an "appeal[] to the jurors' uninformed stereotypes of what mentally

retarded people look like." Because he did not object, he has forfeited the contention on appeal. (*People v. Rices, supra,* 4 Cal.5th at p. 80.) Recognizing this, defendant also contends his attorney was ineffective in failing to object. We disagree.

### *a. Factual Background*

In closing argument, the defense asserted, "None of us are medical professionals or psychiatric professionals, and we may have an opinion about whether or not Mr. Woodruff is mentally retarded or not. But that really isn't as relevant, perhaps, as the professional's interpretation." He told the jury, "Whether you, in your own independent assessment, think Mr. Woodruff is able to communicate well," defendant had scored 65 on the communication portion of the Vineland test. Counsel further argued, "When you start to look at it from a more clinical perspective rather than how you feel about Mr. Woodruff or how you feel about the facts relating to this case, you have to kind of rely on what we're all learning, which is Mr. Woodruff has subaverage intellectual functioning, as defined by the test results of both doctors . . . ." Counsel emphasized that even if the jury were to conclude that it "[l]ooks like he's not mentally retarded [and he] doesn't act mentally retarded," the test results indicated that he was intellectually disabled.

The prosecutor argued, "[T]here are a couple things that I think need some clarification. . . . For instance, counsel told you that your opinion or people's opinion of whether or not Mr. Woodruff is mentally retarded doesn't matter. But that's not true. If it didn't matter, you wouldn't be asked to make this finding. If we only wanted professionals to come in here and make the decision, there would be no need for a jury. Your opinion does matter. That's what we're asking you to do. . . . And I submit this to you: If a person doesn't look retarded or act retarded,

it's because they're not retarded.  It doesn't take any professional to let you know that."  The prosecutor then went on to argue the evidence in the case:  that defendant's overall IQ score was 78 as tested by Rath, that Rath had attributed defendant's low Vineland communication score to his poor writing skills rather than deficits in verbal communication, that Rath had spent time interviewing defendant and observing him, that defendant had been able to work, including at a newspaper, that intellectual disability was defined by "significantly" subaverage intellectual functioning, that the jury had observed defendant every day in court, and that, in defense counsel's words, defendant had been able to go "toe to toe" with the prosecutor during cross-examination.  The prosecutor emphasized Rath's extensive experience, pointed out deficiencies in Booraem's evaluation methods, and noted that psychology is not an "infallible science."

### b.  Analysis

"[M]ental retardation is a question of fact.  [Citations.]  It is not measured according to a fixed intelligence test score or a specific adaptive behavior deficiency, but rather constitutes an assessment of the individual's overall capacity based on a consideration of all the relevant evidence."  (*In re Hawthorne, supra,* 35 Cal.4th at p. 49.)  However, "the medical profession has endeavored to counter lay stereotypes of the intellectually disabled. . . .  Those stereotypes, much more than medical and clinical appraisals, should spark skepticism."  (*Moore v. Texas* (2017) __ U.S. __, __ [137 S.Ct. 1039, 1052], citations omitted.)

Assuming without deciding that the comment was erroneous, we conclude it was harmless because it was said in passing and the prosecutor went on to review the evidence, including the experts' findings, to support his contention that defendant was not intellectually disabled.  Taking the prosecutor's comments as a whole, there is no "reasonable likelihood that the jury construed or applied any of

101

the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Accordingly, defense counsel was not ineffective for failing to object.

### G.  Penalty Phase Issues

In light of the reversal based on *Witt* error, we need not address defendant's penalty phase claims, including the claim of cumulative error, nor his challenges to California's death penalty law.

### H.  Reporter's Transcript Was Duplicated in Several Places and Inaccurate

Section 190.9 requires that a "court reporter [] prepare and certify a daily transcript of all proceedings" in a capital trial.  (§ 190.9, subd. (a)(1).)  Defendant notes several instances where, in violation of this requirement (see *People v. Zambrano* (2007) 41 Cal.4th 1082, 1192), the court reporter appears to have copied earlier proceedings and pasted them in the place of later proceedings instead of preparing an accurate transcription of the later proceedings.  Defendant contends this violated his Eighth and Fourteenth Amendment rights to "an appellate record that is adequate to permit meaningful review."  At the record correction hearing, the trial court denied defendant's motion for a new trial stemming from the reporting issues.

Specifically, defendant cites 11 instances in the reporter's transcript where the reporter copied portions of the transcript of the instructions read to earlier groups of prospective jurors and inserted those portions into the reporter's transcript in lieu of preparing an actual transcription of the court's instructions to later groups of jurors.  Most of the instances defendant identifies concern the jury selection occurring in March 2002, which did not result in a jury because the court dismissed the panel and continued the trial for several months.  The remaining

three instances concern the court's opening statements during the November 2002 jury selection.

" 'All proceedings in a capital case must, under section 190.9, be conducted on the record with a reporter present and transcriptions prepared. [Citation.] " '[N]o presumption of prejudice arises from the absence of materials from the appellate record [citation], and defendant bears the burden of demonstrating that the record is inadequate to permit meaningful appellate review [citations].' " [Citations.]' [Citation.] 'The record on appeal is inadequate . . . only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1070, fn. omitted.)

Here, defendant fails to show that the copying and pasting of the judge's pre-voir dire remarks prejudiced him. He states only that the prejudice is derived "from the realization that the entire record is untrustworthy." Such speculation fails to support a claim that the record prevents meaningful review. (*People v. Young* (2005) 34 Cal.4th 1149, 1170.) Most of the instances of copying and pasting defendant cites occurred during the jury selection that did not result in the seating of a jury and therefore are immaterial to the review of defendant's case. The remaining instances concern the court's opening statements to prospective jurors during the time-qualification phase of jury selection. The copied material concerns mundane matters of no significance and does not prevent meaningful review of defendant's trial. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1194.)

The record, which consists of approximately 6,000 pages in both the clerk's and reporter's transcripts, does not support defendant's claim of untrustworthiness. Moreover, in response to defendant's motion for a new trial, the court made the reporter's original notes available for both parties to review. Defendant has submitted briefing of approximately 300 pages, raising some 26 issues in his

appeal.  " 'With respect to every issue raised on appeal, we have found the record sufficient to permit review.  It is in this context that we must find that any [error] was not prejudicial, because the record is clearly adequate for meaningful appellate review.' "  (*People v. Tully, supra,* 54 Cal.4th at p. 1075.)

Regarding defendant's claim of constitutional violation, we have rejected the argument that "statutory noncompliance automatically violates the Fourteenth or the Eighth Amendments or impairs a defendant's Sixth Amendment right to effective assistance of counsel."  (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1258.)  "The federal due process clause requires only that the state furnish the defendant with a record sufficient to permit adequate and effective review."  (*Ibid*.)

## I.  Asserted Cumulative Error

Defendant claims that even if we determine his asserted errors are not individually prejudicial, we must conclude that their combined cumulative effect requires reversal.  We disagree.  We have found little error, and it did not have cumulative prejudicial effect.  Even if we assume Blankenship's former representation of prosecution witnesses Smith and Carr presented a conflict that defendant did not validly waive, Carr's testimony supported the defense, and Smith testified at the penalty phase only.  To the extent references during the trial to defendant's arrest record and Carr's convictions stemming from the same events were error, the references were brief and insignificant given other evidence in the case presenting this information.  "Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment."  (*People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)

### III. CONCLUSION

We reverse the judgment of death and affirm the judgment in all other respects.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**LEVY, J.***

_____

\* Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Woodruff

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S115378
**Date Filed:** July 19, 2018

_____

**Court:** Superior
**County:** Riverside
**Judge:** Christian F. Thierbach

_____

**Counsel:**

Dennis C. Cusick, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Dennis C. Cusick
3053 Freeport Boulevard, #124
Sacramento, CA  95818
(916) 743-7358

Arlene A. Sevidal
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9071